Kellie G. Sironi
GASTON LAW FIRM
Attorney at Law
P.O. Box 21571
Billings, MT 59104
Telephone: (406) 860-9476
Fax: (406) 254-9899
ksironi@sironilaw.com

Calvin J. Stacey
STACEY & FUNYAK
P.O. Box 1139
Billings, Montana 59103-1139
Telephone: (406) 259-4545
Fax: (406) 259-4540
cstacey@staceyfunyak.com

Matthew B. Hayhurst
Tyler M. Stockton
BOONE KARLBERG P.C.
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
Fax: (406) 549-6804
mhayhurst@boonekarlberg.com
tstockton@boonekarlberg.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

ROBYN DUFFY, individually and as Personal Representative of the Estate of Thomas Duffy, on behalf of the Estate of Thomas Duffy and the Heirs of Thomas Duffy, C.D., S.D., and M.D., the minor children of Robyn and Thomas Duffy, and MARK DUFFY and PAM DUFFY, the parents of Thomas Duffy; and CENTRAL COPTERS, INC., a Montana corporation,

Plaintiffs,

v.

Cause No. 2:21-cv-71-BMM

**PLAINTIFFS' OPPOSITION TO DEFENDANT KAMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DAMAGES**

**REDACTED AND PUBLICLY FILED (*UNREDACTED VERSION FILED UNDER SEAL*): PURSUANT TO THE COURT'S 3/6/25 ORDER**

KAMAN AEROSPACE CORPORATION, a Delaware Corporation,

Defendant.

## Table of Contents

Table of Contents ........ iii

Table of Authorities ........ v

I. Kaman's request for summary judgment on Central's consequential and punitive damages claims fails, because Montana law rejected application of the UCC and the contracts at question are either unconscionable contracts of adhesion or simply not applicable. ........ 3

A. Montana rejected application of the UCC and economic loss rules in product liability actions. ........ 3

B. Kaman's Commercial Price Catalog violates Montana public policy and is an unconscionable contract of adhesion. ........ 8

1. The Commercial Price Catalog violates Montana public policy. ........ 8

2. The Commercial Price Catalog is an unconscionable contract of adhesion. ........ 11

C. Kaman waived raising arguments based on the A94-0038 contract, because it failed to raise it as an affirmative defense and, in any event, the contractual language does not control this case. ........ 16

II. Kaman's request to apply foreign Connecticut law fails, because Montana law applies to this proceeding. ........ 17

III. Central's future profits claims are a quintessential jury question. ........ 19

A. Kaman's future lost profits caselaw is deficient. ........ 19

B. Central's evidence of future lost profits damages more than meets the standard in Montana. ........ 23

C. Kaman's criticism of Central's future lost profits damages are meritless... 25

IV. Kaman's argument regarding Central's remaining helicopters is void, because it failed to file its promised motion *in limine*, and in any event, should not be granted, because the actual market conditions show loss of value. ........ 28

V. Plaintiffs' punitive damages claim should go to the jury, because Kaman knew of issues with its servo flap and chose to inform operators it was a different cause ........ 30

VI. Plaintiffs' experts' opinions are well supported. ........................................35

Certificate of Compliance ..........................................................................36

Certificate of Service ...............................................................................37

## Table of Authorities

### Cases

*Brandenburger v. Toyota Motor Sales, U.S.A.*,
162 Mont. 506, 513 P.2d 268 (1973) .................... 3, 4, 8, 9

*Dalbotten v. C.R. Bard, Inc.*,
No. 1:20-cv-00034-SPW, 2023 U.S. Dist. LEXIS 10346 (D. Mont. Jan. 20, 2023).................... 34

*Dunn v. Ancra Int'l LLC*,
No. CV 10-58-M-DWM, 2011 WL 4478478 (D. Mont. Sept. 26, 2011) .... 33, 34

*Durden v. Hydro Flame Corp.*,
1999 MT 186, 295 Mont. 318, 983 P.2d 943 .................... 8

*Hagen v. Dow Chem. Co.*,
261 Mont. 487, 863 P.2d 413 (1993) .................... 30, 31, 34

*Hostetter v. Donlan*,
221 Mont. 380, 719 P.2d 1243 (1986) .................... 20, 26

*Jim's Excavating Serv. v. HKM Assocs.*,
265 Mont. 494, 878 P.2d 248 (1994) .................... 6, 7

*Kelker v. Geneva-Roth Ventures, Inc.*,
2013 MT 62, 369 Mont. 254, 303 P.3d 777 .................... 15

*Kortum-Managhan v. Herbergers NBGL*,
2009 MT 79, 349 Mont. 475, 204 P.3d 693 .................... 11, 14

*Lee v. Kane*,
270 Mont. 505, 893 P.2d 854 (1995) .................... 20, 21, 26

*Lenz v. FSC Sec. Corp.*,
2018 MT 67, 391 Mont. 84, 414 P.3d 1262 .................... 8, 11, 15

*Masters Grp. Int'l, Inc. v. Comerica Bank*,
2015 MT 192, 380 Mont. 1, 352 P.3d 1101 .................... 18, 19

*Moorman Manufacturing Co. v. Nat'l Tank Co.*,
91 Ill. 2d 69, 61 Ill. Dec. 746, 435 N.E.2d 443 (1982) ....6

*Morris v. Walmart, Inc.*,
No. CV 22-16-BLG-SPW, 2024 U.S. Dist. LEXIS 143998 (D. Mont. Aug. 13, 2024) ....18

*St. Goddard v. Helena Motors*,
No. CDV-2016-788, 2017 Mont. Dist. LEXIS 21 (Mont. First Jud. Dist. Ct. Apr. 27, 2017) ....7

*Stensvad v. Miners & Merchs. Bank*,
196 Mont. 193, 640 P.2d 1303 (1982) ....20

*Streich v. Hilton-Davis, Division of Sterling Drug, Inc.*,
214 Mont. 44, 692 P.2d 440 (1984) ....5, 6

*Thompson v. Nebraska Mobile Homes Corp.*,
198 Mont. 461, 647 P.2d 334 (1982) .... 4, 5, 6

**Statutes**

Mont. Code Ann. § 27-1-221(2) ....30

Mont. Code Ann. § 27-1-719 ....10

**Other Authorities**

MPI.2d 25.42 ....20

MPI.2d 25.92 ....27

**Treatises**

Restatement (Second) of Torts 402A ....3

Through this motion, Kaman Aerospace Corporation ("Kaman") asks the Court to shield it from consequential and punitive damages for placing defective products into the stream of commerce—specifically, helicopters that have now taken three lives due to the same failure—simply because Kaman refers to its "Terms and Conditions" in every sale of a spare or replacement part and because *another* helicopter (not the one that crashed) was sold by Kaman directly to Central Copters, Inc. ("Central"). It also asks this Court to grant summary judgment on the following: (1) that Central's future profits are speculative (even though that question is properly left to the jury), (2) that the value of Central's grounded KMAX fleet has gone up (even though real world sales show millions in losses), and (3) Plaintiffs' punitive damages claim (even though Kaman had knowledge that its servo flaps had cracking issues associated with one death and did not warn operators). These arguments are without merit and the court should deny Kaman's request for summary judgment on Plaintiffs' damages.

The Montana Supreme Court explicitly rejected application of the Uniform Commercial Code ("UCC") to product liability actions. Moreover, Montana law prohibits enforcement of unconscionable adhesion contracts, and, importantly, this Court has already concluded that "[l]ittle question exists that the contract between Kaman and Central Copters for the sale of the blades in question constitutes a

contract of adhesion." (Doc. 35 at 19.) There is, in fact, no doubt that the contracts Kaman relies upon either do not apply or are unconscionable contracts of adhesion.

Damages are not speculative because an expert calculates damages into the future, but then lets the jury decide where the future damages end based upon the testimony provided by the various witnesses. That is a quintessential jury role as the finder of fact. Kaman may lack faith in a jury from Montana, but they are given the power to determine the "reasonable value of earnings that with reasonable probability will be lost in the future." Fed. Pattern Jury Inst. 5.2. Kaman is welcome to challenge Central's arguments for future damages on cross examination, but the Court should not remove the factual question from the jury's hands.

Kaman knew there were allegations that cracking in the servo flap caused the 2010 Woody Crash—yet told operators it was, in fact, something else. Moreover, Kaman has admitted that redesigning the KMAX to address the servo flap weaknesses would be an "extremely expensive endeavor." These, among others, are clear indicators that punitive damages are appropriate and a question the jury should decide.

For the reasons argued below, the Court should reject Kaman's Motion for Partial Summary Judgment in its entirety.

## I. Kaman's request for summary judgment on Central's consequential and punitive damages claims fails, because Montana law rejected application of the UCC and the contracts at question are either unconscionable contracts of adhesion or simply not applicable.

Kaman argues that the UCC controls whether Central is able to pursue consequential damages is subject to particular contractual provisions, which, it argues, do not violate Montana law. Kaman misunderstands Montana law and the Court must reject this argument.

### A. Montana rejected application of the UCC and economic loss rules in product liability actions.

Kaman argues that the UCC permits enforcement of its one-sided Commercial Price Catalog between commercial entities. (Doc. 81 at 11–17.) It even goes so far as to claim that it "has not located any case finding a consequential damages limitation between commercial entities unconscionable under the Montana UCC." (Doc. 81 at 17.) Kaman forgets that Montana has rejected application of the UCC to product liability cases (even for commercial parties) and rejected application of the economic loss rule. Those rulings end the inquiry and foreclose Kaman's attempt to limit Central's damages.

The Montana Supreme Court adopted strict liability for product defects in 1973, when it decided *Brandenburger v. Toyota Motor Sales, U.S.A.*, 162 Mont. 506, 513 P.2d 268 (1973). There, the Montana Supreme Court adopted the Restatement (Second) of Torts 402A definition, that:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) The seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*Id.* at 513–14, 513 P.2d at 272–73 (quotation marks omitted). The *Brandenburger* Court also adopted a number of policy reasons to support adopting strict liability, noting that the goal of strict liability is to place liability where it properly belongs: with the manufacturer of the defective product. *Id.* at 514–15, 513 P.2d at 273.

Then, in 1982, the Montana Supreme Court was asked whether Montana product liability law applied to situations where there was only damage to the product itself. In *Thompson v. Nebraska Mobile Homes Corp.*, the plaintiff had purchased a trailer home "as is" with all express and implied warranties disclaimed in the purchase agreement, but the trailer was found to have significant issues. 198 Mont. 461, 462–64, 647 P.2d 334, at 334–35 (1982). At the close of trial, the defendants moved to dismiss the plaintiff's strict liability claims arguing the only damages were to the product itself, which was granted, and the case was submitted to the jury on the questions of warranty. *Id.* at 465, 647 P.2d at 336. "Defendants were thus allowed to rely on Uniform Commercial Code defenses not available for

strict liability claims." *Id.* On appeal, the Montana Supreme Court concluded the district court had erred, and held that "the doctrine of strict liability in tort to include those instances where the only injury suffered is to the defective product itself." *Id.* at 466, 647 P.2d at 337. It also held: "[s]trict liability is not governed by the Uniform Commercial Code." *Id.* at 468, 647 at 338 (emphasis added).

Though *Thompson* involved a non-commercial plaintiff, a couple years later the Montana Supreme Court concluded that commercial parties could bring strict product liability claims and the UCC did not control the outcome. In *Streich v. Hilton-Davis, Division of Sterling Drug, Inc.*, a commercial potato grower purchased a seed potato treatment designed to suppress sprouting until planting, which damaged the potatoes and, ultimately, a verdict was reached in the plaintiffs' favor. 214 Mont. 44, 47, 692 P.2d 440, 442 (1984). On appeal, the defendant argued that "strict liability in tort has no application in cases of lost profits in a purely commercial setting." *Id.* at 51, 692 P.2d at 444. The defendant argued that given the commercial environment, the policy reasons supporting strict liability did not apply, claiming:

> Hilton-Davis points to cases, such as *Moorman Manufacturing Company v. National Tank Company* (1982), 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, which disallow the application of strict liability in commercial loss cases, leaving the parties to their remedies under the Uniform Commercial Code.

*Id.* at 52, 692 P.2d at 444. *Moorman Manufacturing Co. v. Nat'l Tank Co.,* was an Illinois case which held that the appropriate remedy in commercial settings was that of contract and the UCC remedies bargained for. 91 Ill. 2d 69, 61 Ill. Dec. 746, 435 N.E.2d 443 (1982). However, the Montana Supreme Court explicitly rejected those arguments:

> We held in *Thompson v. Nebraska Mobile Homes Corporation* (Mont. 1982), [197 Mont. 461,] 647 P.2d 334, 39 St. Rep. 1094, that strict liability is not governed by the Uniform Commercial Code. When, as here, the use of a product for the purpose for which it was intended has the foreseeable potential of damaging the users property, the doctrine of strict liability applies.

*Streich*, 214 Mont. at 52-53, 692 P.2d at 444–45 (alterations original; underlining added).

To be even more explicit, the Montana Supreme Court has rejected attempts to impose the economic loss doctrine in Montana. In *Jim's Excavating Service, Inc. v. HKM Associates*, the Montana Supreme Court was asked whether the economic loss doctrine applies to torts in Montana. 265 Mont. 494, 501, 878 P.2d 248, 252 (1994). Jim's Excavating, the contractor on a project, sued the engineer on a project asserting the engineering firm had breached its duty by failing to meet its duty of care regarding certain plans. *Id.* at 500, 878 P.2d at 251. On appeal, the contractor argued there was no contractual liability between parties and therefore it could not be sued in tort. *Id.* at 501, 878 P.2d at 252. The contractor also asked the Montana Supreme Court to adopt "the economic loss doctrine" and hold the

applicable contract remedies were the only remedies available. *Id.* The Montana Supreme Court noted the "majority of jurisdictions" to examine the economic loss doctrine had rejected it and went on to reach the same conclusion. *Id.* at 506, 878 P.2d at 255. Most recently, Montana State District Judge Kathy Seeley was asked to adopt the economic loss rule in a product liability case. *St. Goddard v. Helena Motors*, No. CDV-2016-788, 2017 Mont. Dist. LEXIS 21, at *6 (Mont. First Jud. Dist. Ct. Apr. 27, 2017). Citing *Jim's Excavating*, Judge Seely held: "The Montana Supreme Court has not adopted the economic loss rule." *Id.*

Here, Kaman asks this Court to apply a particular UCC provision permitting certain contractual arrangements and then moves on to analyze the contracts, claiming they limit liability in this product liability actions. That argument, however, completely ignores Montana's explicit rejection of the UCC to strict liability claims (in personal or commercial settings) and its rejection of the economic loss rule. Given the foregoing, Montana law makes clear that tort remedies are available, regardless of contract. And, in particular, that contract remedies do not limit tort remedies. This is particularly true where, as here, the underlying contract is one of adhesion. The Court should, therefore, find Kaman's attempt to impose contractual limitations without merits.

### B. Kaman's Commercial Price Catalog violates Montana public policy and is an unconscionable contract of adhesion.

Kaman argues that it makes every single replacement or spare part subject to its Commercial Price Catalog, which happens to have an extremely one-sided waiver of nearly all damages and purports to limit any liability for Kaman to just replacement of the part itself. The language is so one-sided that except for repair or replacement of the specific part, Kaman is liable for nothing. It purports to disclaim patent or event latent (hidden) defects and even disavows liability for "ANY DAMAGES" grounded in either tort or contract theory. (Doc. 81 at 7.) There is no question the Commercial Price Catalog violates Montana public policy and is an unconscionable contract of adhesion under Montana law.

In Montana, "[t]he terms of an otherwise validly formed contract are unenforceable under generally applicable contract principles if the terms are either contrary to public policy or unconscionable." *Lenz v. FSC Sec. Corp.*, 2018 MT 67, ¶ 25, 391 Mont. 84, 414 P.3d 1262. Both are true in this case.

#### 1. The Commercial Price Catalog violates Montana public policy.

Montana adopted strict product liability in 1973 to "to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product." *Brandenburger*, 162 Mont. at 514, 513 P.2d at 273; *see also Durden v. Hydro Flame Corp.*, 1999 MT 186, ¶ 16, 295 Mont. 318, 983 P.2d 943.

When doing so, the Montana Supreme Court adopted the various policy reasons articulated (discouraging defective products, placing responsibility on manufacturer, etc.). *Brandenburger*, 162 Mont. at 514–15, 513 P.2d at 273. Here, application of the Commercial Price Catalog's terms would violate Montana public policy.

When the Montana Supreme Court adopted strict liability it made clear that the nature of *how* the product was obtained was simply not in the analysis. Rather, the focus was on whether the product was defective. It held:

> Inherent in these policy considerations is not the nature of the transaction by which the consumer obtained possession of the defective product, but the character of the defect itself, that is, one occurring in the manufacturing process and the unavailability of an adequate remedy on behalf of the injured plaintiff.

*Id.* at 515, 513 P.2d at 273 (quotation marks omitted). Put another way, the *means* of acquiring the product is not important, but rather whether there is a *defect*. Here, enforcing the Commercial Price Catalog terms would effectively allow corporations to sidestep products liability law by including waivers or other disclaimers in any agreement to purchase. It would, essentially, flip Montana products liability law on its head by making the "nature of the transaction by which the consumer obtained the product" (*i.e.*, contract) wag the tail of the "character of the defect itself" analysis.

Montana's statutory product liability law does not provide for a contractual affirmative defense to a product liability suit. Montana Code Annotated § 27–1–719 provides that there are two affirmative defenses available to products liability actions: discovery of defect/open and obvious or unreasonable misuse. That is it. Noticeably absent is the ability to raise a contractual waiver or other limitation. Put another way, contractual defenses to products liability are not permitted.

Lastly, as articulated above, Montana has rejected economic loss limitations in products liability actions, as well as UCC remedy limitations. Attempting to skirt around those bars by means of (an unconscionable contract of adhesion) violates Montana public policy.

As such, enforcing the damages limitations in the Commercial Price Catalog would violate established Montana public policy. Product liability exists for a reason: to hold manufacturers of defective products accountable and to provide a remedy for injured consumers. Such is the case here. Kaman's helicopters have now killed three pilots in three similar accidents, yet they boldly claim they could not possibly be responsible for the consequential (or exemplary) damages that could result from litigation regarding this fatality. The Court should find Kaman's attempt to skirt Montana's product liability law violates public policy.

### 2. The Commercial Price Catalog is an unconscionable contract of adhesion.

Unconscionable contracts of adhesion are void in Montana. *Lenz*, ¶ 25. Kaman admits, as it must, this general principle, but argues nonetheless that the Commercial Price Catalog is not a contract of adhesion and, even if it was, Kaman argues that the terms of were in Central's "[r]easonable [e]xpectations" and "[n]ot [u]nduly [f]avorable to Kaman." Kaman is incorrect.

Montana law finds a contract unconscionable—and therefore invalid—if it is a contract of adhesion and "the contract or term unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Lenz*, ¶ 26. "[A] contract of adhesion is a contract wherein a party in superior bargaining position dictates the contract terms to the weaker party on a take it or leave it basis without any reasonable opportunity for negotiation." *Id.* Contracts are considered unconscionable when they are "unduly oppressive, unconscionable or against public policy." *Kortum-Managhan v. Herbergers NBGL*, 2009 MT 79, ¶ 23, 349 Mont. 475, 204 P.3d 693. Importantly, the *Lenz* decision removed the "reasonable expectations" analysis from interpretation of non-insurance contracts. *Lenz*, ¶¶ 27–30. It held that "the reasonable expectations doctrine is not a generally applicable contract principle." *Id.* ¶ 30.

Contract of Adhesion

The Commercial Price Catalog is a contract of adhesion. When it analyzed the forum selection clause in the Commercial Price Catalog, this Court has already found there was "little question . . . that the contract between Kaman and Central Copters for the sale of the blade in question constitutes a contract of adhesion." (Doc. 35 at 19.) That is the law of the case.

Moreover, the facts show that Central, in reality, had no bargaining ability to dictate terms to Kaman on liability or choice of law. Except for minute flexibility on timing of payment or warranty length (factors Kaman seizes on), the Commercial Price Catalog was a take-it-or-leave-it proposition, particularly the limitations of liability and choice of law clause. Kaman was the only place to purchase replacement parts and when Central's helicopters needed maintenance to safely fly or if the KMAX was unusable due to needed repairs. (Doc. 17-4, ¶ 39; Doc 85-3 at 33: 3–6 (there was "nowhere else" to get parts for KMAX helicopters except through Kaman; Statement of Disputed Facts ("SDF"), ¶¶ 93–94.) Indeed, as this Court found several years ago regarding the blade at issue in this case:

> Central Copters' K-Max N314 needed new blades. (Doc. 17-4 at ¶ 38). Kaman was the sole manufacturer of the blades. *Id.* at ¶ 39. Central Copters' helicopter would have been inoperable without the new blades. *Id.*; (Doc. 17 at 31).

(Doc. 35 at 19.) These facts remain true today. As Mark Duffy testified:

> **Q. Did you have a choice to buy parts from anybody else besides Kaman?**
> A. No. Kaman was the manufacturer. It's the only place to get them.
> **Q. So what happens if you didn't like something in the terms and conditions? Was it a take-it-or-leave-it situation?**
> A. Yeah. We couldn't—there's nowhere to get parts except from them.

(Plaintiffs' Statement of Undisputed Facts ("SOUF"), ¶ 41; SDF, ¶ 93.) Without agreeing to what Kaman imposed, Central was without income. Mark testified:

> **Q. When you were ordering parts, did you understand that they were subject to the terms and conditions of the Kaman Commercial Price Catalog?**
> A. No.
> **Q. Why not?**
> A. Well, as I stated earlier, I spoke to the founder of Kaman, Charlie Kaman, and he assured me with a handshake that they were going to stand behind their aircraft. They were going to warranty everything, they were going to take care of it, they were going to support me. And that meant a lot to me. He was the founder of the company.
>
> <u>We never had anyone, during the course of our transaction, shove this document [Commercial Price Catalog] or any document in our face and say, "Hey, you better watch out because we're, you know, subject to these limitations."</u> . . . .

(SDF, ¶ 94 (emphasis added).)

Indeed, Kaman knew that it was the only option for parts and KMAX operators were not permitted to negotiate whether Kaman would be liable for anything:

**Q. What about other terms, like—let me pull this up here, like anything related to Kaman's liability, could an operator realistically just removed that from the—**
A. No.
**Q. —terms and conditions?**
A. No. Not in my experience.
**Q. What about the operator's liability?**
A. Not in my experience that I can remember.
**Q. Or the choice of which law applied, could the operator just strike that?**
A. No. Not that I know of.
**Q. It never happened with you?**
A. No.
**Q. So if Central Copters had said I can't agree to those paragraphs, what is realistically the result? Would they be able to buy the blades?**
A. No. If they—well, I don't think so. I mean, I don't recall that it ever happened so...

(SDF, ¶¶ 95–99.)

There is no question—and this Court has already concluded—that the Commercial Price Catalog was a contract of adhesion. (Doc. 35 at 19.)As such, it is invalid.

Unconscionability

The Commercial Price Catalog's terms are also "unduly oppressive, unconscionable or against public policy." *Kortum-Managhan*, ¶ 23. Kaman's liability release provision is one-sided and sweeping in scope. (Doc. 81 at 7.) Among other provisions, it purports to disclaim any and all liability in tort or contract, for defects (even obvious or hidden ones), and even purports to limit other third parties. (Doc. 81 at 7.) There is no question that its terms are

"unreasonably favorable to the drafter." *Kelker v. Geneva-Roth Ventures, Inc.*, 2013 MT 62, ¶ 20, 369 Mont. 254, 303 P.3d 777.

The Commercial Price Catalog's terms also violate Montana law as articulated above, because they purport to remove a claim for products liability—which is a legal claim explicitly permitted in Montana.

Lastly, Kaman gets tripped up by its misunderstanding of Montana law, arguing that Central "reasonabl[y] expected" these terms because it brought a large number of parts from Kaman over the years. This is not the analysis in a non-insurance context and the Court should appropriately disregard Kaman's arguments on that front. *Lenz*, ¶¶ 27–30.

* * *

Kaman is the only maker of KMAX parts and every operator is forced to come to Kaman to keep its multi-million-dollar aircraft safety flying. Kaman then takes advantage of that opportunity—when parts are desperately needed to return the helicopter to operational status—to dictate entirely self-serving terms, including terms that waive any and all liability in tort for their parts without any meaningful opportunity for Central (or other operators) to negotiate. (SOUF, ¶ 41; SDF, ¶¶ 93–103.) This is the very definition of an unconscionable contract of adhesion and the Court should conclude the damages limitations (both contractual and punitive) are invalid.

### C. Kaman waived raising arguments based on the A94-0038 contract, because it failed to raise it as an affirmative defense and, in any event, the contractual language does not control this case.

Kaman weaves into its arguments a claim that the contract for purchasing one of Central's KMAX helicopters—not the one that crashed—somehow dictates the damages in this case. This simply is not the case.

*First*, Kaman failed to raise this argument as an affirmative defense. Its affirmative defenses only cited the Commercial Price Catalog, not the contract for purchase of A94-0038:

> **Affirmative Defense Five – Contractual Limitations**
>
> **7.** Central Copters' claims are barred, in whole or in part, by the consequential damages limitation found within the Commercial Price Catalog.

(Doc. 39 at 10.) Kaman had until April 2022 to amend its pleadings (Doc. 34 at 2) and in the years following that deadline, it has never once asked to amend its pleadings to add an affirmative defense based on the contract to purchase the non-crashed KMAX at issue in this litigation. Moreover, there is no question Kaman knew about the contract, because it was cited in Kaman's Motion to Dismiss as a reason to dismiss this case to Connecticut. (Docs. 7 & 8.) The Court should, therefore, reject any untimely argument based upon the contract between Kaman and Central to purchase A94-0038.

*Second*, even if the Court considers the contract to purchase A94-0038, it has absolutely no bearing on this case. Central did not purchase the crashed KMAX from Kaman; rather, it purchased it from the U.S. State Department in 2007. (Doc. 17-4, ¶¶ 32–33.) Thus, the crash at issue in this litigation is not and cannot be subject to a contract for the sale of a different helicopter. The product defect at issue in this case arose from the crash in August 2020, as well as the cracking found in other servo flaps.

## II. Kaman's request to apply foreign Connecticut law fails, because Montana law applies to this proceeding.

Central exhaustively briefed this issue in its opening brief for summary judgment, demonstrating in detail how and why Connecticut law does not apply in this case. (Docs. 83, 84, & 85.) Central incorporates that briefing in its entirety, but provides the following brief argument as well.

*First*, although Kaman fails to acknowledge this in its argument, this Court has already ruled that the Commercial Price Catalog is a contract of adhesion and found the forum selection clause invalid, as well as concluded that Montana law applies under the most significant relationship test. (Doc. 35.) Those decisions are binding and end the inquiry here.

*Second*, the forum selection and the choice of law provisions in the Commercial Price Catalog are one and the same. Indeed, they are part of the same

sentence. "Under the 'law of the case' doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Morris v. Walmart, Inc.*, No. CV 22-16-BLG-SPW, 2024 U.S. Dist. LEXIS 143998, at *12 (D. Mont. Aug. 13, 2024) (quotation marks omitted). Such is the case here.

*Third*, even if one redoes the analysis of the most significant relationship test (as Central did in its Motion for Partial Summary Judgment), Montana law applies.

*Lastly*, Kaman attempts to rely upon the Montana Supreme Court's decision in *Masters Grp. Int'l, Inc. v. Comerica Bank*, claiming it supports its argument that the Commercial Price Catalog's contractual choice-of-law provision should somehow apply to Central's tort claims. 2015 MT 192, ¶ 11, 380 Mont. 1, 352 P.3d 1101. Not so. The Montana Supreme Court made clear that in *Masters Group International* the tort claims arise from and related to the contract claims: "Without the contracts that tied Masters and Comerica together, there would be no tort claims." *Id.* ¶ 62. Such is certainly not the case here. There are <u>no</u> contract claims against Kaman; rather, this case sounds in negligence and product liability, both of which are common law and statutory doctrines in Montana, not a contract between Kaman and Central. Moreover, as outlined above, the Commercial Price Catalog is an unconscionable contract of adhesion. In *Master's Group International*, there

was absolutely no argument the contract(s) at issue were ones of adhesion. *Id.* ¶ 4 (noting contract negotiated by legal teams from each side).

For the foregoing reasons and those outlined in Central's Motion for Partial Summary Judgment and its supporting brief, the Court should reject any attempt to apply Connecticut law to this Montana proceeding, involving Montana plaintiffs, and Montana damages. Montana law applies.

## III. Central's future profits claims are a quintessential jury question.

Kaman claims that Central's *future* damages (those after June 30, 2024, by its definition) are speculative, because, it asserts, Central's experts have not provided sufficient information for a jury to be able to make a determination. (Doc. 81 at 28.) Thus, Kaman argues, Central's future damages are speculative and the question should not even be given to the jury. Kaman's argument is based on a faulty understanding of Montana law and of the evidence provided by Central's damages experts: Drs. Timothy Kober and Douglas Abbott, both of Montana Tech's Department of Business.

### A. Kaman's future lost profits caselaw is deficient.

Kaman cites a single case for its proposition that lost profits cannot be speculative. This legal framework is quite deficient. As outlined above, Montana has refused to adopt the economic loss rule in products liability cases, therefore, future lost profits can and are available in commercial product liability

proceedings. "Damages for loss of profits may be awarded if not speculative." *Lee v. Kane*, 270 Mont. 505, 511, 893 P.2d 854, 857 (1995). "[W]here injury caused by the breach is certain, damages for lost profits may be awarded **even though the amount of damage is uncertain**." *Hostetter v. Donlan*, 221 Mont. 380, 382, 719 P.2d 1243, 1245 (1986) (emphasis added). Indeed,

> Once liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court.

*Stensvad v. Miners & Merchs. Bank*, 196 Mont. 193, 206, 640 P.2d 1303, 1310 (1982).

The Montana Pattern Jury Instructions reflect this as well:

> INSTRUCTION NO. ______
>
> ( ) Your award should include lost profit or other prospective gain from the operation of plaintiff's business. Damages for lost profits or other gains are recoverable only to the extent that the evidence affords a reasonable basis for their determination. However, recovery cannot be denied simply because damages are difficult to determine.

MPI.2d 25.42 (emphasis added).

Importantly, Kaman misunderstands the term "speculative damages." Whether lost profits are considered "speculative" or not depends on whether it is "mere guesswork as to whether or not the claimed damages is a result of the Defendants' action, rather than to an uncertainty as to the amount of the damages." *Lee*, 270 Mont. at 511–12, 893 P.2d at 857. Uncertainty in the amount is categorically not impermissible speculation—that is the jury's decision. All the jury needs is a reasonable basis for its determination.

Moreover, lost profits do not need to be supported by expert testimony in Montana. In *Lee*, the plaintiff, a restaurant owner alone testified to his business's own damages, including future damages. 270 Mont. at 509–10, –13–14, 893 P.2d at 856–59. The district court permitted the question of past and present lost profits to go to the jury, but gave a limiting instruction that no future damages could be considered by the jury, because there was no expert testimony on the subject. *Id.* On appeal, the plaintiff argued that the district court should have permitting future lost profits to go the jury. *Id.* at 513–14, 893 P.2d at 858–59. In analyzing the question, the Montana Supreme Court reversed the district court, concluding:

> [T]his Court does not require expert testimony to prove lost profits; we only require that lost profits be proven with the best evidence under the circumstances which will support a reasonably close estimate of the loss.

*Id.* at 514, 893 P.2d at 859 (quotation marks and alterations omitted; emphasis added).

Finally, Kaman omits reference to the applicable Ninth Circuit pattern jury instructions on damages. Applicable to this instant argument, Pattern Instruction No. 5.2 states that lost profits are recoverable:

> In determining the measure of damages, you should consider:
>
> * * *
>
> [The reasonable value of . . . [earnings] [earning capacity] . . . [business opportunities] [employment opportunities] lost up to the present time;]
>
> [The reasonable value of . . . [earnings] [earning capacity] . . . [business opportunities] [employment opportunities] that with reasonable probability will be lost in the future;]

(Emphasis added.) As to *how* the present value is to be calculated, Pattern Instruction 5.4 instructs:

> [Any award for future economic damages must be for the present cash value of those damages.]
>
> * * *
>
> The rate of return to be applied in determining present cash value should be the interest that can reasonably be expected from safe investments that can be made by a person of ordinary prudence, who has ordinary financial experience and skill. [You should also consider decreases in the value of money that may be caused by future inflation.]

(Emphasis added.)

Given the foregoing, Montana law does not require expert testimony on future lost profits. Whether there is uncertainty on the amounts is not the Montana definition of "speculative damages." And, the appropriate discount rate, as well as amount of damages, are quintessential jury questions.

### B. Central's evidence of future lost profits damages more than meets the standard in Montana.

Here, Central put forth more than sufficient evidence through both its expert witnesses and one of its owners, Mark Duffy, for the question of future lost profits to be sent to the jury.

As outlined in the expert report of Drs. Kober and Abbott, they took a holistic view of Central's finances to compare the revenues pre-crash (averaged) with the revenues post-crash (averaged) to come up with Central's future lost profits (beyond the actual lost profits already known through June 30, 2024). (SDF, ¶¶ 105–08.) This, Dr. Abbott explained, is appropriate because it takes the prior years (good or bad) and compares them with the post-crash years (good or bad). (SDF, ¶ 107.) As Dr. Abbott testified:

> <u>I'm of the opinion that if you use this holistic approach, if you compare pre crash with post crash, in the pre-crash years, there are going to be good years and bad years. The best indicator of future results are going to be past results.</u> So what we assumed is pre crash for Central Copters, for example, they're going to have good fire years and they are going to have bad fire years. The numbers support that in our analysis.
>
> If I'm not mistaken, 2019 was a very bad year for Central Copters and their firefighting. Rather than ignoring that number and just using the good years to try to inflate our numbers, we said, "No, we need to look at the data we have available for the pre-crash years and use those as an indicator of items in the post-crash years."
>
> So we did not do any individual analysis, for example, on fire impact or fire seasons because we assume that the numbers pre crash would

> have had those type of things included in them. The 2019 fire year would be a prime example of that. That was a bad year.

(SDF, ¶ 107 (emphasis added).) Drs. Kober and Abbott then took that average loss and extrapolated it into the future, providing three different discount rates for the jury to consider, along with exemplar years of mitigation, again for the jury to determine based on the evidence provided:

[redacted]

(SDF, ¶ 105.)

Lest there be any doubt, Drs. Kober and Abbott are two tenured professors at Montana Tech, both of whom teach in the Business Department. (SDF, ¶ 109.) And the methodology used by them is one they use routinely and is consistent with what they teach at Montana Tech:

> **Q. The methodology that you have described as a "holistic methodology," a "pre-crash/post-crash methodology," do I understand correctly that this is a methodology you have used many times before in other cases?**
>
> A. Yes.

**Q. And is it a method that, you just mentioned recently, that you feel is sound? Did I hear you correctly?**
A. Yes.
**Q. Is it consistent with your understanding of economics and business and, in fact, consistent with what you teach over at Montana Tech?**
A. Yes.
**Q. You talked about the 12 percent versus 16 percent versus 20 percent discount rate and leaving that ultimate decision up to the jury to make that call, right?**
A. Yes.
**Q. Are all of those options reasonable for the jury to choose, 12 versus 16 versus 20?**
A. Yes.
**Q. Likewise, when it comes to making these decisions, whether it's about a discount rate, about the number of years it would take for Central Copters to get fully online with the Black Hawks, or whether it's the retirement age that Mr. Duffy would have used had he survived, are all of those decisions that you believe a reasonable juror can make, based on the evidence presented in a case?**
A. I do believe they could make an informed decision, yes.

(SDF, ¶ 111.)

**C. Kaman's criticism of Central's future lost profits damages are meritless.**

Despite Montana law and testimony from two Montana Tech professors, Kaman claims Central's damages are speculative for three reasons: (1) supposed lack of information to calculate into the future; and (2) lack of testimony regarding the discount rate; and (3) consistent (as opposed to declining) damages into the future. These arguments fail and the question of Central's future lost profits should be given to the jury.

*First*, the question of *amount* and *length* of future lost profits does not need to be supported by expert testimony in Montana. "[T]his Court does not require expert testimony to prove lost profits; we only require that lost profits be proven with the best evidence under the circumstances which will support a reasonably close estimate of the loss." *Lee*, 270 Mont. at 514, 893 P.2d at 859 (quotation marks and alterations omitted; emphasis added). Here, Drs. Kober and Abbott relied upon Central's tax returns to establish the average pre-crash and post-crash revenues, because, as Dr. Abbott testified, "[t]he best indicator of future results are going to be past results." (SDF, ¶ 107.) That is what they calculated, which is perfectly acceptable under Montana law.

*Second*, Dr. Kober's testimony about not knowing *precisely* how far out damages would go or how much is being perfectly honest, because no one knows the future. Moreover, certainty about the future is not the standard. In Montana, "damages for lost profits may be awarded **even though the amount of damage is uncertain**." *Hostetter*, 221 Mont. at 382, 719 P.2d at 1245 (emphasis added). This is precisely why Drs. Kober and Abbott use past revenue (averaged) to estimate future performance and compare that to what losses are known (averaged) to come up with a reasonable means of projecting what the loss could be. In short, the methodology accounts for the fact that no one knows the future.

*Third*, Drs. Abbot and Kober's depreciation analysis is perfectly reasonable and does what is appropriate in Montana: provide the calculations to the jury so it may determine the appropriate discount rate. The Pattern Jury Instruction provides guidance and allows the jury to "[c]hoose a fair rate of interest on reasonably safe investments," MPI.2d 25.92, and here, Drs. Abbott and Kober will provide a range of amounts with corresponding discount rates, all of which Dr. Abbott testified were reasonable:

> **Q. You talked about the 12 percent versus 16 percent versus 20 percent discount rate and leaving that ultimate decision up to the jury to make that call, right?**
> A. Yes.
> **Q. Are all of those options reasonable for the jury to choose, 12 versus 16 versus 20?**
> A. Yes.

(SDF, ¶ 111.) Then, it is up to the jury to determine what they believe is appropriate. That is not speculation, it is appropriately providing the jury the information to then make the decision.

*Fourth*, Kaman is welcome to cross examine Drs. Abbott and Kober about the method they used to calculate damages into the future on a straight line. Their methodology, however, is reputable and relied upon here in Montana. (SDF, ¶¶ 109–11.) It takes a pre-incident analysis and compares to the post-incident in the same way. It is holistic and accounts for good and bad financial years. The jury may agree or not, but the determination is left to the jury, not Kaman's arguments.

*Lastly*, Kaman's misunderstanding regarding what constitutes "speculative damages" in Montana undergirds its entire argument. Damages are only speculative in Montana if they are not tied to the breach at issue in the case. Kaman morphs this into an argument to claim that reasonable, good faith estimates into the future are speculative, because the future is unknown. This is not the law. Damages are not speculative when they are hard to calculate or calculating into the future is uncertain. In those situations, Montana law permits the jury to consider the evidence and make its determination. Such is the case here. Central's experts have done a holistic analysis of Central's pre- and post-crash business and to come up with a reasonable estimate of losses into the future. How much and how far is left to the jury.

## IV. Kaman's argument regarding Central's remaining helicopters is void, because it failed to file its promised motion *in limine*, and in any event, should not be granted, because the actual market conditions show loss of value.

Kaman asserted that it would bring a motion *in limine* to exclude evidence of lost value regarding the three grounded KMAX helicopters. It argued that "[t]o the extent the Court grants Kaman's motion, Kaman reserves the right to seek summary judgment on the basis that Central has failed to establish any lost-value damages claim as to its remaining helicopters." (Doc. 81 at 28.) Kaman, however,

did not bring that motion *in limine*; therefore, this part of its motion for summary judgment fails out of the gates.

However, to the extent that the Court entertains Kaman's brief argument, the Court should reject it. *First*, Kaman failed to produce any evidence about the value of the crashed helicopter or the values of the grounded three KMAX helicopters. Its lack of an expert disclosure on the value of Central's KMAX helicopters is fatal. *Second*, Central's appraiser did establish the value of the crashed helicopter was just over [redacted], and the remaining three *should* be worth between [redacted] (SDF, ¶ 87, 112.) However, [redacted] (SDF, ¶ 113.) That is a loss of nearly [redacted] from undisputed fair market value. As is appropriate, Mark Duffy testified that the amount received in the sale should be offset from the damages, but that leaves him with [redacted] (Doc. 85-3 at 123:4–9.) As Central's appraiser concluded:

[redacted]

(SDF, ¶ 114.)

Central has actual losses incurred in the sale of one of its KMAX helicopters due to the soft market for them following the three fatal crashes. The jury should be able to determine what Central's losses are and award those damages if they believe them appropriate.

## V. Plaintiffs' punitive damages claim should go to the jury, because Kaman knew of issues with its servo flap and chose to inform operators it was a different cause.

Kaman argues that Plaintiffs do not have sufficient evidence to support a punitive damages claim. This argument fails and the jury should be given the opportunity to consider and decide whether punitive damages are appropriate.

Montana law provides clear guidance on punitive damages. Such exemplary damages may be awarded where the defendant acts with actual malice. Mont. Code Ann. § 27–1–221(2). "Actual malice occurs when a defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and then proceeds to act with indifference or disregard of the high probability of injury." *Hagen v. Dow Chem. Co.*, 261 Mont. 487, 497, 863 P.2d 413, 420 (1993); *see also* Mont. Code Ann. § 27–1–221(2).

At the summary judgment stage, Plaintiffs do not need to establish that, in fact, Kaman acted with actual malice. Instead, the question is whether there is a genuine dispute with regard to punitive damages and whether Kaman acted with actual malice as defined under Montana law. In *Hagen*, Dow Chemical Company

sought and was granted summary judgment on the plaintiff's punitive damages, arguing, like here, that there was no evidence of actual malice. *Id.* at 496, 863 P.2d at 419. On appeal, the plaintiffs argued (like they had below) that Dow Chemical knew about certain research that indicated the chemical was unsafe at a certain (lower) level and had done some internal research on the same, but Dow Chemical still represented the unsafe level was higher than the research indicated. *Id.* at 496–97, 863 P.2d at 419–20. The Montana Supreme Court reversed the district court concluding that knowledge of contradictory research was sufficient for the punitive damages question to go to the jury:

> After reviewing the record, we conclude that there was evidence that Dow was aware that its product had characteristics which created a high probability of damages to people like the Hagens. <u>A factual dispute exists regarding whether Dow represented to EPA that a warning label was not required when it knew otherwise, and whether Dow represented that it was safe to mix the herbicides and apply the mixture in the vicinity of fish cultures, when it knew otherwise.</u> Therefore, we conclude that a genuine factual dispute exists on the issue of punitive damages and summary judgment should not have been granted.

*Id.* at 497, 863 P.2d at 420.

Here, discovery is not yet complete,[1] but Kaman knew there were issues with the servo flap following the 2010 Woody Crash, which also killed the pilot. In

---

[1] Plaintiffs will be taking Kaman's Rule 30(b)(6) deposition closer to trial. Additional evidence regarding punitive damages very well may be discovered in that deposition.

the Woody Crash litigation, the plaintiff there produced expert testimony regarding cracking in the servo flap, which concluded that the servo flap had failed in-flight just like the failure in this case. (SDF, ¶¶ 115–17.) Indeed, that same expert has opined that the crashes are quite similar. (SDF, ¶¶ 116–17.)

Following the Woody Crash, Kaman brought all KMAX operators to Connecticut and, instead of disclosing what the Woody Crash expert had concluded, Kaman hid that material and presented its own theory:

> **Q. Do you recall anything in particular that Tim Graham said to you about the Woody accident?**
>
> A. What had finally happened is Kaman—every operator was concerned about that accident just like ours because they operate K-MAXs. And Kaman called all the operators back to Connecticut and gave us an expose on what they thought happened.
>
> And I feel like they were pretty much lying to us at that meeting because of the Exponent report and the way they addressed it. <u>They knew what had happened to Woody's aircraft because Exponent had told them, but they didn't tell us. And we wanted—we were operating the aircraft. They didn't tell us.</u>
>
> **Q. Have you ever talked to anyone at Kaman who states that they agree with the Exponent analysis of the Woody accident?**
>
> A. No.
>
> **Q. What did Kaman tell the operators that happened at the Woody accident?**
>
> A. They said that the spar failed on the blade. And so they reduced the life of the blade from 16,000 down to 8,000 hours with additional inspections. And, yeah, the spar failed when the blades collided, but that was caused by the servo flap.

(SDF, ¶¶ 64, 118–19 (emphasis added).) Kaman would also testify that were there to be an issue with the servo flap, it would have to recertify the KMAX with the Federal Aviation Administration, which would be [redacted] endeavor. (SDF, ¶ 120.)

Here, there is more than sufficient evidence for the jury to consider what Kaman knew, whether it constitutes actual malice, and whether punitive damages are appropriate. Like *Hagen*, Kaman and Dow Chemical were on notice that there were dangers associated with its product. Yet Kaman, like Dow Chemical, did not warn its consumers or provide notice that there were dangers associated with the KMAX's servo flap. The jury should be able to determine whether Kaman's actions constitute actual malice. Moreover, discovery is not yet complete and Plaintiffs will be taking Kaman's Rule 30(b)(6) deposition, which could add additional facts supporting Plaintiffs' punitive damages claim.

As just one example, Kaman analogizes this case to *Dunn v. Ancra Int'l LLC*, No. CV 10-58-M-DWM, 2011 WL 4478478, at *5 (D. Mont. Sept. 26, 2011), where there was, at most, evidence of "14 known incidents" compared to "more than 400,000 load binders sold." (Doc. 81 at 36.) The present case stands in stark contrast. While KMAX production and accidents are topics of the upcoming Kaman 30(b)(6) deposition on April 4, 2025, Kaman is believed to have produced approximately 60 KMAX helicopters, yet there have been 3 fatal crashes and an

even greater number of other crashes. **That equates to a *fatality* rate—not an incident rate—of 5% (*i.e.* 3 ÷ 60).** This is far greater than the incident rate of .0035% in *Dunn* (*i.e.* 14 ÷ 400,000). **In fact, the *fatality* rate for KMAX helicopters is 1,428 times greater than the *incident* rate in *Dunn*.**

If one out of every 20 vehicles (5%) made by a particular car manufacturer crashed due to an alleged defect and killed the driver, there is little question that a jury would be entitled to consider that evidence, along with the manufacturer's actions (or lack thereof) in addressing this horrific problem, in determining whether to assess punitive damages for later fatalities. Montana courts have allowed punitive damage claims to go to the jury under similar circumstances. *Hagen*, 261 Mont. at 497, 863 P.2d at 419–20 (reversing summary judgment on punitive damages where there was evidence that defendant "was aware that its product had characteristics which created a high probability of damages to people like the [plaintiffs]"); *Dalbotten v. C.R. Bard, Inc.*, No. 1:20-cv-00034-SPW, 2023 U.S. Dist. LEXIS 10346, at *7 (D. Mont. Jan. 20, 2023) (rejecting summary judgment motion on punitive damages where fraud claims survived motion to dismiss).

Kaman was also aware of the problem after the 2010 Woody Crash when the first pilot was killed. Kaman was put on notice by the Woody Crash litigation and, if that was not enough, a published article identified the cause of that fatal crash as

cracking in the servo flap—the same condition here. And Kaman's own expert recently admitted that in this crash [redacted] (SDF, ¶ 122.)

For all of these reasons, the Court should deny Kaman's request for summary judgment on Plaintiffs' punitive damages.

**VI. Plaintiffs' experts' opinions are well supported.**

Kaman's final summary judgment request is that it be permitted to file additional summary judgment motions should certain motions *in limine* be granted in its favor. This argument is unsupported and, as will be briefed, Plaintiffs' experts are well supported. That said, this question is premature and the Court should reserve ruling until after the motions *in limine* have been decided and further subsequent briefing (if necessary).

Dated: March 7, 2025

BOONE KARLBERG P.C.

/s/ Tyler M. Stockton
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff*

**Certificate of Compliance**

Pursuant to Local Rule 7.1(d)(2) of the Federal Rules of Civil Procedure, I certify that this brief (excluding the caption, table of contents, table of authorities, table of exhibits, certificate of compliance, and certificate of service) complies with the word limit of not more than 9,000 words, containing 8,346 words according to the word count calculated by Microsoft Word.

Dated: March 7, 2025

BOONE KARLBERG P.C.

*/s/ Tyler M. Stockton*
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff*

**Certificate of Service**

I hereby certify that the foregoing was served by the Clerk of the U.S. District Court of Montana, Butte Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

Dated: March 7, 2025

BOONE KARLBERG P.C.

*/s/ Tyler M. Stockton*
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff*