Mark S. Williams
Williams Law Firm, P.C.
235 E. Pine, P.O. Box 9440
Missoula, Montana 59807-9440
(406) 721-4350
mark@wmslaw.com
wlfmail@wmslaw.com

*Attorneys for Defendant Kaman Aerospace Corporation*

Additional Counsel Listed on Signature Page

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| ROBYN DUFFY, individually and as Personal Representative of the Estate of Thomas Duffy, on behalf of the Estate of Thomas Duffy and the Heirs of Thomas Duffy, C.D., S.D., and M.D., the minor children of Robyn and Thomas Duffy, and MARK DUFFY and PAM DUFFY, the parents of Thomas Duffy; and CENTRAL COPTERS, INC., a Montana corporation,<br><br>Plaintiffs,<br><br>v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware Corporation,<br><br>Defendant. | Case No. 2:21-cv-71-BMM<br><br>**REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DAMAGES** |

As established in Defendant Kaman Aerospace Corporation's ("Kaman") opening papers, Plaintiff Central Copters, Inc. ("Central") is indisputably a sophisticated corporate entity that expressly agreed to the application of Connecticut law and to a limitation on damages. Although Connecticut law therefore should apply, Central's agreement to limit its damages would be honored by Montana law as well as Connecticut law. Central's opposition does nothing to change that fact. And punitive damages are not recoverable as no reasonable jury could find clear and convincing evidence of actual malice by Kaman.

## ARGUMENT

### A. Per Central's Own Agreement, Connecticut Law Applies and Precludes Its Consequential Damages.

Connecticut law applies to this dispute, not Montana law, because Central explicitly agreed to it. *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 392 (2016) ("[I]t is well established that parties are free to contract for whatever terms on which they may agree"); *Barber v. Bradford Aquatic Grp. LLC*, 414 Mont. 170, 175 (2023) ("parties enjoy a broad freedom to contract around the terms of their private dealings"). [redacted] (Dkt. 82, "SUMF" ¶ 42; Ex. 19, Executed 2015 Rev. Blade Sales Letter CC0029485.) [redacted]

[redacted] (*Id.* ¶ 48; Ex. 22, 2015 Kaman Commercial Price Catalog KAM-0000054538) (emphasis added)[1]

Central does not dispute that the consequential damages it seeks are not recoverable under Connecticut law. *See* Dkt. 81 at 18-21. To avoid this result, Central does everything it can to avoid being bound by its own agreement to the application of Connecticut law.

//

[1] Despite Central's contentions otherwise, the Agreement expressly encompasses tort claims, and Montana has found similar choice-of-law provisions to encompass tort claims. While Central attempts to distinguish only one of the cases that Kaman cites, *Masters Grp. Int'l, Inc. v. Comerica Bk.*, 380 Mont. 1, 21 (2015), Central's tort claims *do* arise out of its contract with Kaman, as it purchased the allegedly defective servo flap directly from Kaman.

### 1. *The Contractual Limitations in Kaman's and Central's Agreement is Not Unconscionable.*

First, Central argues that its agreement is unconscionable. It isn't. "A contract or included term is equitably unconscionable if (1) the contract or term is a contract or term of adhesion and (2) unreasonably favors the stronger party or is unduly oppressive to the weaker party." *Bucy v. Edward Jones & Co., L.P.*, 396 Mont. 408, 427 (2019). Central's agreement is not a contract of adhesion, nor is it unduly oppressive.

Discovery has indisputably established that [redacted]. (SUMF ¶¶ 16-41). Moreover, Central had bargaining power—the record is clear that Central can and did negotiate certain terms with Kaman over its 20-year business relationship, but that it never sought to negotiate the choice-of-law or limitation-of-liability provisions. (*Id.*). "Although courts have readily applied the doctrine of unconscionability to contracts between consumers and skilled businessmen, they are reluctant to rewrite the terms of a contract between businessmen themselves." *All-States Leasing Co. v. Top Hat Lounge, Inc.*, 198 Mont. 1, 6 (1982). On behalf of Central, Mark Duffy says he "just do[esn't]" read the terms and conditions he is agreeing to. Dkt. 82-6, Ex. 6, Duffy Tr. Excerpts 50:10-17. However, "[f]ailure to read and understand a clear and ambiguous agreement, absent mistake, is not a defense to its enforcement." *Polzin*

*v. Appleway Equip. Leasing, Inc.*, 345 Mont. 508, 515 (2008).[2] Central cannot avoid its own agreement because it is not unconscionable.

### ***2. The Law of the Case Doctrine Does Not Apply, But Even if it Did, It Would Not Compel Application of Montana Law.***

Central relies on the law-of-the-case doctrine to argue that this Court has already held that Montana law applies to the issue of its consequential damages, and that Central's express agreement to limit its damages is a contract of adhesion. That is not accurate.

The law-of-the-case doctrine provides that "a court is generally precluded from reconsidering an *issue* that has already been decided by the same court, or a higher court in the identical case." *Morris v. Walmart, Inc.*, No. CV 22-16-BLG-SPW, 2024 WL 3784113, at *4 (D. Mont. Aug. 13, 2024) (emphasis added) (rejecting application of the law of the case doctrine). Under the rule of dépeçage courts can "determine which state's laws apply to *each claim or issue* in a case, rather than making a blanket decision to cover all claims." *Sivil v. Country Mut. Ins. Co.*, 619 F. Supp. 3d 1072, 1076 (D. Nev. 2022) (emphasis added). Although this Court previously applied Montana law to the issue of *venue*, it did not necessarily decide that it also applied to the completely distinct issue of *consequential damages*, and so the law-of-the-case doctrine does not apply.

[2] Notably, Central has never alleged, let alone submitted indisputable evidence of, any mistake.

Even if venue and consequential damages were the same, the Court did not "actually consider and decide" the law governing them using the correct choice-of-law analysis. *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995) (emphasis added). Specifically, the Court did not address Restatement (Second) of Conflict of Laws § 187(1) (the "Restatement"), which supplies the applicable rules when parties have agreed to the applicable law to govern their contractual rights and duties, as is the case here. *See Barber*, 414 Mont. at 175 (applying Restatement § 187(1) because the parties contractually agreed upon the governing law). Thus, for this independent reason as well, the law-of-the-case doctrine does not apply.

But even if the Court were to conclude that the doctrine applied here, it could and should depart from it if: "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Morris*, 2024 WL 3784113, at *4. Several of these factors are present here.

At the time the Court denied Kaman's motion to transfer, the factual record was sparse. In fact, the Court did not have access to the 2015 Commercial Price Catalog, expressly incorporated into the 2015 Blades Sale Agreement, and only had before it the self-serving, unchallenged declaration of Mark Duffy saying that he was unaware of the forum selection provision. Since then, however, the relevant

agreement has been identified and produced (SUMF ¶ 48), and discovery in this case has indisputably established that [redacted]. (*Id.* ¶¶ 16-41).

Central also invites error by continuing to argue that, even if the Court had not already decided this issue, the most significant relationship test applies and warrants application of Montana law. Again, however, the Court must first look to Restatement § 187(1), which Plaintiffs conspicuously ignore. *See Barber*, 414 Mont. at 175. The Restatement analysis compels the application of Connecticut law, and neither of its exceptions apply because (1) Connecticut indisputably has a relationship to the parties and their agreement, and (2) applying Connecticut's freedom-to-contract principles, including the freedom to limit consequential damages, would not contravene a fundamental Montana policy. *Barber*, 414 Mont. at 175 (enforcing parties' choice of law and explaining that "parties enjoy a broad freedom to contract around the terms of their private dealings").

**B. Even if Montana Law Applied, Kaman Would Prevail.**

Even if the Court were to apply Montana law, Central's own agreement, including its choice-of-law and limitation-of-liability provisions, would be enforceable. "In Montana, parties enjoy a broad freedom to contract around the terms

of their private dealings so long as their agreements do not conflict with public policy." *Barber*, 414 Mont. at 175.

Contrary to Central's mischaracterization, Kaman is not asking the Court to "apply a particular UCC provision permitting certain contractual arrangements." (Dkt. 162 at 7.) Rather, Kaman is asking the Court to uphold Central's and Kaman's broad freedom under Montana law to structure their private relationship as sophisticated commercial entities–a freedom which Central does not, because it cannot, dispute. *Barber*, 414 Mont. at 175. While the UCC itself, both in Connecticut and Montana, permits contracting parties to limit the availability of damages, it is Montana's broad freedom to contract that belies Central's position.

Central also argues that the Montana Supreme Court has rejected application of the UCC to strict liability claims. But Central's claims are not limited to strict liability (Dkt. 151 at 12-13) ("Plaintiffs' Complaint includes a claim for negligence, not just strict liability"), and its reliance on *Thompson v. Nebraska Mobile Homes Corp.*,198 Mont. 461, 462–64, 647 P.2d 334, at 334–35 (1982), is misplaced in any event as it involved a *non-commercial* entity as plaintiff. Central also attempts to rely on *Streich v. Hilton-Davis, Div. of Sterling Drug*, 214 Mont. 44, 51 (1984). But that case involved a potato farmer. Central, a multi-million-dollar government contractor and operator of aircraft, is materially dissimilar. In all events, what the Court actually held there is that, in strict liability torts cases, plaintiffs could pursue

recovery of purely economic losses and were not limited to the damages available under the UCC. *Id. Streich* did not hold that, consistent with Montana's broad freedom-to-contract principles, parties cannot contractually limit liability for purely economic losses.

Likewise, Central's argument that the economic loss doctrine does not apply in Montana is a red herring because Central expressly agreed otherwise. Indeed, neither case it now relies on involved an express contractual provision limiting liability between commercial entities. *See Jim's Excavating Serv., Inc. v. HKM Assocs.*, 265 Mont. 494, 501 (1994) (determining whether plaintiff was permitted to sue in tort for purely economic losses where there was "no contractual privity" between the parties); *St. Goddard v. Helena Motors*, No. CDV-2016-788, 2017 Mont. Dist. LEXIS 21 (Mont. First Jud. Dist. Ct. Apr. 27, 2017) (finding that plaintiff, an individual who sued a car dealership for faulty repairs, was not limited to contract remedies).

### C. Central's Waiver Argument Fails

Central argues that Kaman somehow waived its ability to refer to the parties' 2006 Aircraft Sale Agreement as part of its argument because it failed to raise it as an affirmative defense. But waiver is applicable only "where there is intentional or voluntary relinquishment of a known right, claim, or privilege." *Matter of Est. of Pelzman*, 261 Mont. 461, 465, (1993), as modified on denial of reh'g (Dec. 22, 1993).

This strict standard is not met here, where Kaman did raise this agreement with respect to its affirmative defense of forum non conveniens, which put Central on more than sufficient notice. (Dkt. 39). In any event, Central's argument is a red herring. It is the parties' 2015 Blades Sale Agreement, not the 2006 Aircraft Sale Agreement, that governs here, so Central's argument is inapposite.

### D. Plaintiffs' Lost Profits Analysis is Speculative and Unreliable.

Central contends that uncertainty over the *amount* of future loss profits is not the same as inappropriate speculation. That truism doesn't resolve this issue. Indeed, "[a]lthough uncertainty as to the amount of any alleged lost profits is not improper speculation, uncertainty about whether the loss of profits *is the result of the wrong* and whether such profit *would have been derived at all* renders the evidence inadmissible as speculative." *Tarter v. Throne L. Off., P.C.*, No. CV 17-123-BLG-SPW, 2019 WL 462985, at *5 (D. Mont. Feb. 6, 2019) (emphasis added) (omitting internal quotation marks). That is precisely the problem here. As established in Kaman's reply in support of its Motion *in Limine* No. 7, courts in this Circuit have excluded testimony regarding lost profits where a decline in profits could have been caused by something other than the alleged wrongdoing by the defendant. *See Educ. Logistics, Inc.*, 2012 WL 761950, at *8 (granting summary judgment on lost profits claim because expert "did not consider any factors—other than [defendant's] misconduct—that might have caused the decline"); *McGlinchy v. Shell Chem. Co.*,

845 F.2d 802, 806-07 (9th Cir. 1988) (excluding expert's "before and after" assessment of lost profits because expert "attributed all of the future lost profits to acts of [defendant]" but admitted "the cause of the decline in sales theoretically could have been anything.")

Here, as established in Kaman's memorandum of law in support of its Motion *in Limine* No. 7 (Dkt. 115) and its supporting reply brief, Abbott and Kober have explained that they engaged in a "holistic" view of Central's income before and after the crash and contributed the entire net loss to the loss of the K-MAX helicopters, without considering anything else that may have affected Central's income following the August 2020 accident, such as fluctuations in firefighting demand and the COVID-19 pandemic. Further, Abbott and Kober then projected this net loss 15 years into the future, estimating the exact same loss year after year, despite acknowledging that Central's losses have been decreasing since 2021. They have given no guidance whatsoever on when Central's damages might end, or further change their trajectory, and why. Likewise, Abbott and Kober would leave it to the jury to determine the appropriate discount rate of Central's future lost profits, and provide no guidance at all on how to make that judgment. For these reasons and as explained in more detail in the briefing supporting Kaman's Motion *in Limine* No. 7 (Dkt. 111), Central's approach is untethered from reality and plagued by rank speculation that render the analysis inadmissible.

In addition, while Central may not be *required* to submit expert testimony on lost profits as it contends (Dkt. 162 at 22), it is required to "provide evidence such that the jury is not left to speculation or guesswork in determining the amount of damages to award." *McGlinchy*, 845 F.2d at 808*; see also Skagway Jewelry Co., LLC v. Westmark Hotels, Inc.*, No. 1:16-CV-00005-RRB, 2017 WL 3634077, at *2 (D. Alaska July 24, 2017) (explaining that expert testimony is beneficial in providing substantial evidence of lost profits). This they have not done, for the reasons explained above and in the briefing supporting Kaman's Motion *in Limine* No. 7.[3]

**E. Plaintiffs' Punitive Damages Claims Are Barred.**

Punitive damages are an extraordinary remedy and "should be applied with caution." *Dunn v. Ancra Int'l LLC*, No. CV 10-58-M-DWM, 2011 WL 4478478, at *5 (D. Mont. Sept. 26, 2011). Here, Plaintiffs' punitive damages theory is that Kaman was on notice of alleged defective glue bond in the end cap of its servo flap before Thomas Duffy's accident and therefore acted with actual malice in failing to correct that glue bond or warn operators of it. But Plaintiffs' notice argument hinges on their own expert Rakow's opinion in prior *litigation* relating to the 2010 Woody accident. Putting aside the fact that Rakow's opinion there was prepared for purposes of litigation, was challenged by Kaman, and rejected by the NTSB, his opinion in

[3] With respect to lost value relating to Central's remaining K-MAX helicopters, Central has failed to articulate a coherent damages analysis consistent with their own experts and Kaman reserves the right to challenge it as appropriate as trial.

Woody identified a *totally different* root cause than the one in his opinion in this case. In Woody, Rakow opined that Kaman *negligently* failed to identify a preexisting impact mark during a blade overhaul. It had *nothing* to do with a purportedly defective glue bond with the closeout. Here, in stark contrast, he opines that there was a glue bond defect in the closeout of a servo flap. In no way did Rakow's prior completely different, challenged, and rejected opinion in Woody *reasonably* put Kaman on notice of a design or manufacturing defect with the glue bond used on the end cap of the servo flap. There is simply no clear and convincing evidence that Kaman knew about the glue bond issue—which has been newly and uniquely raised in this lawsuit—prior to Thomas Duffy's accident.[4] Punitive damages should be precluded.[5]

## CONCLUSION

For the foregoing reasons and the reasons laid forth in Defendant's Motion, Defendant respectfully requests that the Court grant summary judgment with respect to Central's consequential damages claims, including lost-profit and diminution-in-

[4] This is in contrast to the authority cited by Plaintiffs, *Hagen v. Dow Chem. Co.*, 261 Mont. 487, 496 (1993), in which the "record [was] replete" with contradictory evidence about the alleged safety of the product at issue.

[5] Plaintiffs attempt to distinguish *Dunn v. Ancra Int'l LLC*, No. CV 10-58-M-DWM, 2011 WL 4478478, at *5 (D. Mont. Sept. 26, 2011), by claiming that the fatality rate here is larger than the incident rate there. That is a distinction without a difference. The purported fatality rate, especially when considered in the context of the exceedingly challenging environments in which these aircraft are used, does not somehow prove actual malice.

value damages for the remaining K-MAXs, and Plaintiffs' punitive damages claims.

Dated this 14th day of March 2025.

*/s/ Mark S. Williams*
Mark S. Williams
Williams Law Firm, P.C.

Kevin M. Smith, *pro hac vice*
Robyn Gallagher, *pro hac vice*
Wiggin and Dana LLP
20 Church Street
Hartford, CT 06103
(203) 498-4579
(475) 201-2125
ksmith@wiggin.com
rgallagher@wiggin.com

*Attorneys for Kaman Aerospace Corporation*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing support brief complies with the 3,250 word limit set forth in L.R. 7.1(d)(2)(B), in that it consists of 2,974 words as calculated by Microsoft Word for Microsoft 365, excluding the parts of the brief exempted by the rule; and with L.R. 1.5(a), in that it is double spaced except for quoted material and footnotes, and typewritten in 14-pt font size.

Dated this 14th day of March 2025.

/s/ *Mark Williams*
Mark Williams, Esq.
Attorney for Defendant