Kellie G. Sironi
GASTON LAW FIRM
Attorney at Law
P.O. Box 21571
Billings, MT 59104
Telephone: (406) 860-9476
Fax: (406) 254-9899
ksironi@sironilaw.com

Calvin J. Stacey
STACEY & FUNYAK
P.O. Box 1139
Billings, Montana 59103-1139
Telephone: (406) 259-4545
Fax: (406) 259-4540
cstacey@staceyfunyak.com

Matthew B. Hayhurst
Tyler M. Stockton
BOONE KARLBERG P.C.
P.O. Box 9199
Missoula, MT 59807
Telephone: (406) 543-6646
Fax: (406) 549-6804
mhayhurst@boonekarlberg.com
tstockton@boonekarlberg.com
*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

ROBYN DUFFY, individually and as Personal Representative of the Estate of Thomas Duffy, on behalf of the Estate of Thomas Duffy and the Heirs of Thomas Duffy, C.D., S.D., and M.D., the minor children of Robyn and Thomas Duffy, and MARK DUFFY and PAM DUFFY, the parents of Thomas Duffy; and CENTRAL COPTERS, INC., a Montana corporation,

Plaintiffs,

v.

Cause No. 2:21-cv-71-BMM

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

KAMAN AEROSPACE CORPORATION, a Delaware Corporation,

Defendant.

Despite bearing the burden of proof for its affirmative defenses,[1] Kaman Aerospace Corporation ("Kaman") cannot meet its burden to support its affirmative defenses for the applicability of the Connecticut Products Liability Act (Aff. Def. 4), contractual limitations on liability (Aff. Def. 5), and contributory/comparative fault (Aff. Def. 6). Plaintiffs' Motion for Partial Summary Judgment should be granted.

## ANALYSIS

### I. Kaman's defenses asserting that the Connecticut Product Liability Act bars the claims in this case (Aff. Def. 4) and that Plaintiffs' damages are limited to contract damages (Aff. Def. 5) fail as a matter of law.

Kaman argues that Connecticut law applies and limits Central's claims because the Commercial Price Catalog ("Catalog") that purportedly applies to customers like Central Copters, Inc. ("Central")—who have no choice but to purchase KMAX parts from Kaman—contains a choice of law provision designating the governing law for any claims in Connecticut, and purports to limit Central's damages—including liability for hidden defects. This argument fails.

[1] Kaman withdrew its Third, Seventh, and Eighth Affirmative Defenses. (Doc. 142 at 11.)

### A. The Court has already concluded that the Catalog did not dictate the forum and was an unconscionable contract of adhesion.

Years ago, this Court concluded that "[l]ittle question exists that the contract between Kaman and Central Copters for the sale of the blades in question constitutes a contract of adhesion" and that "the forum selection clause does not apply to Central Copters' tort claims." (Doc. 35 at 19.) Those findings stand as to the Catalog's choice of law and damages limitations as well.

In response, Kaman primarily argues that, at the time of this Court's ruling, the factual record had not been developed and Kaman now has more information on Central's business. (Doc. 142 at 8–9.) This is insufficient to support a departure from the Court's previous ruling. *See Morris v. Walmart, Inc.*, No. CV-22-16-BLG-SPW, 2024 U.S. Dist. LEXIS 143998, at *12 (D. Mont. Aug. 13, 2024).

As Kaman acknowledges, this Court may only depart from the law of the case if certain errors or changes happen. (Doc. 142 at 14.) None of those changes have occurred. In fact, the passage of time has only made Central's case stronger for this Court to uphold its finding. Tim Graham, the Kaman representative who dealt with Central and signed the agreement on which Kaman relies for its choice of law and liability limitation defenses, confirmed Mark Duffy's testimony: Central had no choice, could not modify, and certainly could not remove any choice of law provision or liability limitation from the Catalog if it wanted to get parts for its helicopters. (Doc. 161, Ex. A at 59:24–60:7, 60:11–24).

The Court has already determined the forum selection clause in the Catalog does not control, and it should reaffirm that finding and conclude, as a matter of law, that the choice of law and damage limitations do not apply to this case.

**B. Even if the Court were to reevaluate the Catalog, the outcome is still the same: it is a contract of adhesion.**

Montana law holds contracts that are "contrary to public policy **or** unconscionable" are not enforceable. *Lenz v. FSC Sec. Corp.*, 2018 MT 67, ¶ 25, 391 Mont. 84, 414 P.3d 1262 (emphasis added). Kaman's Catalog here is both contrary to public policy **and** unconscionable and should not be enforced.

**1. The Catalog violates Montana public policy.**

The goal of Montana's adoption of strict product liability was "to place liability on the party primarily responsible for the injury occurring, that is, the manufacturer of the defective product." *Brandenburger v. Toyota Motor Sales, U.S.A.*, 162 Mont. 506, 514, 513 P.2d 268, 273 (1973). The nature of *how* the product was obtained is not the analysis; the focus is whether the product was defective:

> Inherent in these policy considerations is not the nature of the transaction by which the consumer obtained possession of the defective product, but the character of the defect itself . . . .

*Id.* at 515, 513 P.2d at 273 (quotation marks omitted). This is confirmed by Montana's statutory product liability law—there is no contractual affirmative defense to a product liability suit. *See Teague v. Remington Arms Co., LLC*, No.

CV-18-184-M-DLC, 2022 U.S. Dist. LEXIS 198806, at *16 (D. Mont. Nov. 1, 2022) (citing Mont. Code Ann. § 27-1-719(5)). The analysis of whether there is a *defect* trumps an analysis on the *means* of acquiring the product.

Kaman's argument that choice of law provisions do not violate Montana public policy misses the point. (Doc. 142 at 18.) The Catalog's *object* is to get around Montana's expressed policy provisions regarding strict product liability—even going so far as to limit liability for <u>hidden</u> defects in the products. The Catalog violates Montana public policy and is void in Montana.

**2. The Catalog is an unconscionable contract of adhesion.**

Kaman claimed it would provide this Court evidence Central regularly "negotiated" with Kaman under the Catalog, implying that Central is equal in bargaining power to Kaman. This is not supported by the evidence.

*First,* Mark never "negotiated" terms of the Catalog. He testified the Catalog's pricing was "pretty unreliable" (like when a $200 spacer was listed in the Catalog at $2,000) so he would call Graham, who would "go back and make adjustments when there were ridiculous price increases as such. So you couldn't rely on the book [Catalog] at all." (Doc. 85-3 at 38:22–41:2, 43:15–19.)

Mark also testified Kaman might allow a different payment plan in special situations. (Doc. 161, ¶ 32.) These were not negotiations, as Kaman claims, but requests related to Central's need to keep its aircraft flying. Central never

negotiated the warranty provisions. Tim Graham simply explained to Mark when the warranty protections began—when the part was installed on the helicopter. "Tim and I went over that very closely. And he said, 'That warranty starts once you start using the blades. And it is not a stockroom warranty, it's a use warranty.'" (Doc. 85-3 at 44:13–45:21.)

*Second*, Kaman admits it was the only place to purchase KMAX parts and purchasing from Kaman was a "take-it-or-leave-it situation." (Doc. 143, ¶ 41.) As Graham admitted:

> **Q. What about other terms, like—let me pull this up here, like anything related to Kaman's liability, could an operator realistically just removed that from the—**
> A. No.
> **Q. —terms and conditions?**
> A. No. Not in my experience.
> **Q. What about the operator's liability?**
> A. Not in my experience that I can remember.
> **Q. Or the choice of which law applied, could the operator just strike that?**
> A. No. Not that I know of.
> **Q. It never happened with you?**
> A. No.

(Doc. 161, ¶ 99.) Kaman does not have evidence of meaningful negotiation between equal parties. Given Kaman's admission Central could not remove or modify the choice of law and liability limitations, the evidence shows no "reasonable opportunity" for negotiation required under Montana law. *Lenz*, ¶ 26.

*Third,* Kaman incorrectly makes much of a purported course of dealing with Central over a "20-year business relationship," in which, it claims, Central never tried to negotiate the liability or choice of law provisions. (Doc. 142 at 20–21.) As stated above, this would have been pointless. Moreover, during the course of that "20-year relationship" at <u>no point</u> did Kaman inform Central the Catalog had liability limitations that would gut its claims made here. (Doc. 161, ¶ 94.) Mark testified:

> We never had anyone, during the course of our transaction, shove this document [Commercial Price Catalog] or any document in our face and say, "Hey, you better watch out because we're, you know, subject to these limitations." It was a very cordial agreement. We bought parts, we used parts.

(Doc. 161, ¶ 94.) Indeed, Central <u>did not</u> know or understand sales were subject to the Catalog's terms. (Doc. 161, ¶ 94.) And, Graham never discussed any governing law provision or liability limitations in the Catalog with Central. (Doc. 85-3 at 46:24–47:12).

*Fourth*, Kaman's implication that Central could have just bought a different helicopter if it did not like the Catalog terms is false. This claim wrongly assumes Kaman explained the draconian impact of the Catalog's language—that Central's purchase of any small part formed an agreement that, should Central's helicopter crash (even if the helicopter itself was *not* purchased under the Catalog), Central's claim would be severely limited <u>even if the parts were defective and caused</u>

damages (as in this case). This claim also ignores the reality that Central had very few other choices in helicopter platforms given Central's market for precision long-line lift work. (Doc. 85-3 at 20:17–21:9.) Moreover, Central got into the KMAX industry because Charlie Kaman shook Mark's hand and promised him that Kaman "w[as] going to stand behind their aircraft. They were going to warranty everything, they were going to take care of it, they were going to support me. And that meant a lot to me. He was the founder of the company." (Doc. 85-3 at 59:19–25.) No one manufactures a "lift ship" like KMAX and, while Central searched other platforms, no others are designed for heavy repetitive lifting like a KMAX. (Doc. 85-3 at 28:4–10, 33:23–34:10.) Blackhawks are more expensive to operate, require two pilots rather than one, must undergo major demilitarization modifications to convert to work like firefighting, and Central only opted to move to the Blackhawk platform when it grounded its KMAX helicopters after this crash. (Doc. 85-3 at 197:8–13, 199:25–200:8.)

*Fifth*, Kaman's claim that Central is a large company is not the correct analysis. The question is whether the stronger party dictates terms to the weaker party "without any reasonable opportunity for negotiation." *Lenz*, ¶ 26. Such is the case here. Central had no "reasonable opportunity" to negotiate, Kaman admits those terms were non-negotiable, the Catalog was a "take-it-or-leave-it situation,"

and Kaman was the only place to obtain parts. In any event, Central is a small company when stacked up against Kaman.

*Sixth*, Kaman's argument Central knew how to include its own choice of law provisions into contracts is misleading. Central negotiated a sale of a KMAX in 2024 to a South Korean operator years *after* Kaman raised the choice of law issues here. (Doc. 85-3 at 120:12–121:21 (discussing terms of South Korean sale).) Central's decision in 2024 does not inform what it knew when it purchased parts from Kaman nearly years and years earlier.

*Seventh*, the Catalog was incorporated by *reference* in the contract at issue; it was not directly part of the agreement to purchase the blades at issue. Instead, the document signed by Central had a phrase buried into the text, saying:

> As shown on the attached Schedule A, Central Copters Inc. will make 3 payments as described in Schedule A. This sale is subject to Kaman Aerospace Corporation's terms and conditions of sale, a copy of which you have received as part of the Kaman 2015 Commercial Price Catalog.

(Doc. 82, ¶ 42; Ex. 19.) That was it, but Kaman now claims that incorporation by reference makes the Catalog's terms and conditions regarding Connecticut law and liability waivers enforceable. Not so.

*Lastly*, the Catalog's terms are "unduly oppressive, unconscionable or against public policy." *Kortum-Managhan*, ¶ 23. Kaman's liability release provision is one-sided and sweeping in scope. (Doc. 81 at 7.) Kaman cannot reasonably argue the Catalog is not unduly oppressive. The Catalog disclaims even

*latent and hidden defects.* (*See* Doc. 19-2 at 20.) It also purports to disclaim any and all liability, except for replacement of the part at issue, if the warranty applies. (*See* Doc. 19-2 at 20.) There is no question its terms are "unreasonably favorable to the drafter." *Kelker v. Geneva-Roth Ventures, Inc.*, 2013 MT 62, ¶ 20, 369 Mont. 254, 303 P.3d 777.

### C. Montana's choice-of-law analysis also dictates that Montana law applies to this case.

Even if the Court does not rely on its prior ruling or separately find that the Catalog is still an unconscionable contract of adhesion, the Montana choice of law analysis reaches the same outcome.

Kaman argues that the Restatement (Second) of Conflict of Laws § 187(1) controls here. Not so. Central does not have contractual claims against Kaman. (*See Generally* Doc. 38.) As such, Kaman's reliance on *Barber v. Bradford Aquatic Grp., LLC*, 2023 MT 233, 414 Mont. 170, 539 P.3d 648, and *Masters Grp. Int'l, Inc. v. Comerica Bank*, 2015 MT 192, 380 Mont. 1, 352 P.3d 1101, is entirely off base. In both of those cases, the Montana Supreme Court made clear the torts at issue were contract-based torts. *Barber*, ¶ 7 ("Barber's claims raise only questions sounding in contract."); *Master's Grp, Int'l, Inc.*, ¶ 62 ("Without the contracts that tied Masters and Comerica together, there would be no tort claims."). In contrast, Montana law provides that the most significant relationship test controls for tort claims. *Phillips v. GMC*, 2000 MT 55, ¶ 23, 298 Mont. 438, 995 P.2d 1002 ("[W]e

now hereby adopt the 'most significant relationship' test approach to determine the applicable substantive law for issues of tort."). Plaintiffs conclusively examined the most significant relationship test in their opening brief and Kaman's lack of a rebuttal is fatal. (Doc. 84 at 30–35.)

However, even under §187(1), as Kaman proposes, the result is the same: Montana law applies. Under Restatement §187(1), the "laws of the state chosen by the parties to govern their contractual rights and duties will be applied if . . . ." To start, as detailed above, the parties did not *choose* Connecticut law because the Catalog was a contract of adhesion which prohibited Central from ever negotiating the choice-of-law provision. For this reason alone, § 187(1) is inapplicable.

Next, § 187(1) does not apply if: (1) Connecticut has no substantial relationship to the parties or transaction and there is no reasonable basis for the parties choice; or (2) application of Connecticut law is contrary to the policy of Montana—the state that has a materially greater interest in the determination of the issue and would be the state of the applicable law absent any choice by the parties. Restatement (Second) Conflict of Laws § 187(2). As detailed in Plaintiffs' opening brief, Connecticut's relationship to the parties and transaction is significantly less than Montana's. Further, application of Connecticut law would violate Montana's product liability laws, as Central has argued in its opening briefing. (Doc. Consequently, even if § 187(1) applied, which it does not, at least one if not both

of the exceptions under § 187(2) apply, confirming that Montana law, not Connecticut law, applies.

Further, even if the principle of dépeçage applied, Montana has clearly held in *Phillips* that §§ 145 and 6 of the Restatement applies to tort claims. ¶¶ 23–30. That is the analysis Plaintiffs included in their opening brief, which Kaman failed to respond to, and the Montana Supreme Court and this Court have utilized to resolve issues such as the one before the Court. For brevity, and given Kaman's lack of a response to Plaintiffs' §§ 6 and 145 arguments, Plaintiffs' incorporate and refer the Court to its opening brief. (Doc. 84 at 30–35.) That said, in brief, this case has a Montana pilot, Montana business, Montana-owned KMAX, the Plaintiffs are all Montana residents, and the damages occurred in Montana. (Doc. 85, ¶¶ 1–5, 37–39, 41.) Montana law applies.

## II. Kaman's contributory/comparative negligence defense (Aff. Def. 6) fails.

Despite Kaman's concession there was no misuse or intervening cause here, it attempts to sneak its tree strike theory in through a contributory/comparative theory. The Court should reject this backdoor approach. Not only did Kaman fail to disclose appropriate expert witnesses to support this affirmative defense, it also cannot prove Tom Duffy was negligent. Accordingly, Plaintiffs' Motion for Partial Summary Judgment should be granted as to Affirmative Defense No. 6.

Kaman bears the burden to prove its affirmative defenses. MPI 2.14 makes this quite clear:

> The defendant has the burden of proving that the plaintiff was negligent. As to this defense, the defendant has the burden of proving the following: (1) that the plaintiff was negligent; and (2) that plaintiffs' negligence was a cause of plaintiffs' injury.

Despite its burden, Kaman failed to disclose <u>any</u> experts on piloting or maintenance. It argues it has no obligation to present expert testimony on Tom's piloting skills and instead Kaman's liability experts will argue a tree strike was the most likely cause of Tom's accident. (Doc. 142 at 19.)

This argument has two fatal flaws. First, to get to the *cause* argument, Kaman must prove negligence, *i.e.*, duty and breach, which in this case requires expert testimony on piloting it has failed to provide. *Second*, it is untrue that no expert testimony is needed on piloting or maintenance. <u>Anything</u> beyond the province of the common experience of jurors must be supported by expert testimony. *Dubiel v. Mont. DOT*, 2012 MT 35, ¶ 17, 364 Mont. 175, 272 P.3d 66. Here, piloting and operating a KMAX is clearly beyond a juror's common experience. *See In. re Crash of Aircraft N93PC on July 7, 2013*, No. 3:15-cv-0112-HRG, 2021 U.S. Dist. LEXIS 121164, at *14 (D. Alaska June 28, 2021). Neither of Kaman's experts disclosed any opinions on the standard of care or breach thereof for piloting and maintaining the KMAX. (Doc. 85, ¶¶ 45–47).

This Court should disregard Kaman's argument that pilot error expert testimony is not necessary when a helicopter hits a tree. This ignores the facts here. Kaman's tree strike theory requires that—in the span of a single second—the helicopter here move a hundred feet north of the dip site, return to the river, and crash, before another GPS entry is made (which was recorded every second). To prove its theory, the piloting expert Kaman was required to produce must be able to establish that Kaman's proffered speculation is possible, doable, and that it was done, then, that hitting the tree was, in fact, negligent. None of Kaman's expert witnesses determined on a more likely than not basis that Tom's helicopter hit a tree (that is, until Dr. Orloff asserted his unfounded claim in an untimely disclosure during his deposition). And, to make this argument Kaman must remove the negligence determination from the jury and show that anytime a helicopter hits a tree negligence is automatically assumed. The reality is there are many scenarios where something seemingly wrong does not rise to the level of negligence absent an expert's explanation of the facts and context. A helicopter, doing backcountry firefighting work and allegedly hitting a tree is one such scenario.

Kaman's failure to disclose appropriate experts is fatal. As such, the Court should enter summary judgment in Plaintiffs' favor on Kaman's contributory/comparative negligence defense (Aff. Def. 6).

## CONCLUSION

Plaintiffs' opening brief requests the Court enter summary judgment in their favor on Kaman's Third, Fourth, Fifth, Sixth, Seventh, and Eighth Affirmative Defenses. In response, Kaman withdrew its Third, Seventh, and Eighth Affirmative Defenses and, as argued above, Kaman's last three affirmative defenses have no legal foundation. As such, Plaintiffs' respectfully request the Court to enter summary judgment on Affirmative Defenses Nos. 3, 4, 5, 6, 7, and 8.

Dated: March 21, 2025

BOONE KARLBERG P.C.

*/s/ Tyler M. Stockton*
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2) of the Federal Rules of Civil Procedure, I certify that this brief (excluding the caption, table of contents, table of authorities, table of exhibits, and certificate of compliance) complies with the word limit of not more than 3,250 words, containing 3,197 words according to the word count calculated by Microsoft Word.

Dated: March 21, 2025

BOONE KARLBERG P.C.

*/s/ Tyler M. Stockton*
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served by the Clerk of the U.S. District Court of Montana, Butte Division, through the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

Dated: March 21, 2025

BOONE KARLBERG P.C.

*/s/ Tyler M. Stockton*
Tyler M. Stockton
Matthew B. Hayhurst

Kellie G. Sironi (SIRONI LAW FIRM)
Calvin J. Stacey (STACEY & FUNYAK)
*Attorneys for Plaintiffs*