IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| ROBYN DUFFY, individually and as Personal Representative of the Estate of Thomas Duffy, on behalf of the Estate of Thomas Duffy and the Heirs of Thomas Duffy, C.D., S.D., and M.D., the minor children of Robyn and Thomas Duffy, and MARK DUFFY and PAM DUFFY, the parents of Thomas Duffy; and CENTRAL COPTERS, INC., a Montana corporation,<br><br>Plaintiffs,<br><br>v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware Corporation,<br><br>Defendants. | No. 2:21-CV-71-BMM<br><br>ORDER |

## INTRODUCTION

Defendant Kaman Aerospace Corporation ("Kaman") has filed a Motion for Summary Judgment. (Doc. 80.) Plaintiffs Robyn Duffy, as personal representative of the estate of Thomas Duffy, Mark and Pam Duffy, the parents of Thomas Duffy,

1

and Central Copters, Inc., (collectively "Plaintiffs"), oppose the Motion. (Doc. 162.) The Court held a hearing on the motion on March 17, 2025. (Doc. 194.)

## BACKGROUND

This case involves a lawsuit filed by Robyn Duffy, as the Personal Representative of the Estate of Thomas Duffy ("Duffy"), along with their minor children, Thomas's parents Mark and Pam Duffy, and Central Copters, Inc. ("Central") against Kaman Aerospace Corporation. (Doc. 38 at 1–2.) Mark and Pam Duffy own Central and employed Thomas. (*Id.*) Duffy was an experienced helicopter pilot who was killed in a helicopter crash on August 24, 2020, while fighting a wildfire in Oregon's Mount Hood National Forest. (*Id.* at 2.)

Plaintiffs allege that a defectively designed, manufactured, and marketed servo flap on the blades of the K-MAX helicopter, which Kaman manufactured, caused the crash. (*Id.* at 2.) Plaintiffs claim that Kaman knew of a previous similar crashes involving the same model of K-MAX helicopter, but failed to inform Duffy or Central. Plaintiffs allege that Kaman's failure to inform deprived them of the opportunity to make an informed decision about the helicopter's airworthiness. (*Id.* at 2–3.)

Plaintiffs allege that Duffy's death has caused significant grief and loss to his family, including his wife, children, and parents, who are all residents of Gallatin County, Montana. (*Id.* at 3–4.) Central, a Montana corporation, owned the K-MAX

helicopter and alleges that they have suffered damages due to the loss of use of other K-MAX helicopters. (*Id.* at 4.)

Plaintiffs allege that Kaman, a Delaware corporation with its principal place of business in Connecticut, engaged in the business of designing, manufacturing, and selling the K-MAX helicopter. (*Id.* at 4–5.) The Court properly exercises jurisdiction over the case, and the venue remains proper in Gallatin County, Montana. (*Id.* at 5–6; *see also* Doc. Doc. 35.) Plaintiffs seek to hold Kaman accountable for the defective product and its wrongful actions, claiming damages for the loss of Duffy and the impact on Central's operations. (Doc. 38 at 6–7.)

## STANDARD OF REVIEW

Summary judgment proves appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine material fact dispute requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248.

## DISCUSSION

Kaman makes five arguments in its summary judgment motion related to the exclusion of certain categories of damages. (Doc. 81.) Kaman argues first that the terms and conditions of the contract between Kaman and Central bar consequential

and punitive damages under Connecticut Law. (*Id.* at 10–27.) Kaman contends second that Central's future lost profits are speculative. (*Id.* at 22–27.) Kaman alleges third that Central has suffered no lost-value damages regarding its remaining helicopters. (*Id.* at 27–28.) Kaman contends fourth that no evidence supports Plaintiffs' claim for punitive damages. (*Id.* at 28–32.) Kaman finally challenges the methodology of Plaintiffs' damage expert. (*Id.* at 32.) The Court will address each issue in turn.

## I. Whether the Contract's Terms and Conditions Bar Central's Claims for Consequential and Punitive Damages

Kaman argues that Central is a sophisticated corporate entity that entered into multimillion-dollar contracts with Kaman. (*Id.* at 10–11.) Kaman contends that the negotiated terms of the contract bar consequential and punitive damages. (*Id.*) Kaman seeks to enforce the consequential and punitive damages waivers in the Commercial Price Catalog under the Uniform Commercial Code, as they are not unconscionable. (*Id.* at 11–12.) Kaman rejects the claim that the contracts to purchase the helicopters qualify as contracts of adhesion due to Central's status as a sophisticated business capable of negotiating terms. (*Id.* at 13–15.) Kaman asserts in the alternative that even if the contracts were considered adhesion, the contract's terms fell within Central's reasonable expectations and do not prove to be unduly

oppressive. (*Id.* at 15–17.) Kaman contends finally that punitive damages waiver remains enforceable as it reflects a mutual decision to allocate risk. (*Id.* at 17.)

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996). Montana law unequivocally rejects the application of the Uniform Commercial Code ("UCC") and economic loss rules in product liability actions. *See Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268 (Mont. 1973); *Thompson v. Nebraska Mobile Homes Corp.*, 647 P.2d 334, 338 (Mont. 1982); *Streich v. Hilton-Davis, a Div. of Sterling Drug, Inc.*, 692 P.2d 440, 444–48 (Mont. 1984); *Jim's Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248, 252–56 (Mont. 1994).

The Montana Supreme Court adopted the doctrine of strict liability in *Brandenburger*. 513 P.2d at 272–73. The Montana Supreme Court outlined several policy reasons to support adopting strict liability with the goal of placing liability where it belongs—with the manufacturer of the defective product. *Id.* at 273. Nine years later the Montana Supreme Court answered in the affirmative the issue of whether strict product liability applies to scenarios where only the product sustained damage. *Thompson*, 647 P.2d 334.

The plaintiff in *Thompson* purchased a trailer home. *Id.* at 334–35. The purchase agreement disclaimed express and implied warranties. *Id.* The trailer home

5

later was found to have significant defects. *Id.* The defendants moved to dismiss the plaintiff's strict liability claims at the end of trial by arguing that the plaintiff had suffered no harm as only the product itself had been damaged. *Id.* at 336. The defendants "were thus allowed to rely on Uniform Commercial Code defenses not available for strict liability claims." *Id.* The Montana Supreme Court determined that the trial court had erred in granting the defendants' motion at trial. *Id.* at 337. The Montana Supreme Court recognized that "the doctrine of strict liability in tort [includes] those instances where the only injury suffered is to the defective product itself." *Id.* The Montana Supreme Court explicitly confirmed that "[s]trict liability is not governed by the Uniform Commercial Code." *Id.* at 338.

*Streich* answered the question of whether a commercial entity could bring a strict liability claim. 692 P.2d at 444–48. The plaintiff in *Streich*, a commercial potato grower, purchased a potato sprout suppressant. *Id.* at 442. The suppressant damaged the potatoes. *Id.* The jury returned a favorable verdict for the plaintiff. *Id.* The defendant argued on appeal that strict liability did not apply in a commercial setting. *Id.* 444. *Streich* rejected the argument noting that "[w]hen . . . the use of a product for the purpose for which it was intended has the foreseeable potential of damaging the users['] property, the doctrine of strict liability applies." *Id.* at 444–45.

6

*Jim's Excavating* provided additional guidance on tort liability in Montana. 878 P.2d 248. The plaintiff in *Jim's Excavating*, the contractor on the project, sued the engineer on the project for negligence. *Id.* at 251 The defendant engineering firm argued that no contractual liability existed between the parties, and, therefore, the engineering firm could not be sued. *Id.* at 252. The defendant engineering firm contended that it owed a duty of care only to the owner of the project who stands in privity of contract with the engineering firm. *Id.* The defendant engineering firm also sought to apply the economic loss doctrine and argued that contractual remedies should be the only available remedies. *Id.* The Montana Supreme Court disagreed and instead followed "the clear trend in other jurisdictions" to allow a negligence action for economic loss even without direct privity of contract. *Id.* at 253–54.

Kaman attempts to argue that Montana's freedom to contract principles support its argument. (*See* Doc. 81 at 18 – 21.) Kaman relies on *Masters Grp. Int'l, Inc. v. Comerica Bk.*, 352 P.3d 1101 (Mont. 2015). *Masters Grp. Int'l* involved a financial dispute between Masters and Comercia Bank related to a series of loan agreements and amendments. *Id.* at 1104–06. The loan agreement and amendments culminated in a forbearance agreement that Comerica allegedly breached by offsetting Masters' accounts without notice, leading to the collapse of Masters' business operations. *Id.*

7

*Masters Grp. Int'l* first addressed the choice-of-law provision in the contract between the parties. *Id.* at 1115–16. *Masters Grp. Int'l* confirmed the validity of the choice-of-law provision. *Id.* The Montana Supreme Court was "persuaded . . . by the context of [the] dispute that the choice-of-law provision encompasse[d] Masters' tort claims arising from the contract." *Id.* at 1116. It was reasonable under the "circumstances to infer that . . . the choice-of-law provision [] apply to all disputes arising out of [the parties'] dealings." *Id. Masters Grp. Int'l* acknowledged that the tort claims arose from, and were related to, the contract claims: "[w]ithout the contracts that tied Masters and Comercia together, there would be no tort claims." *Id.* The plaintiff in *Masters Grp. Int'l* alleged tort claims of constructive fraud, deceit, and interference with and loss of prospective economic opportunity. *Id.* at 1117. Kaman's argument at summary judgment fails.

The present case differs from *Masters Grp. Int'l*. The constructive fraud, deceit, and interference with and loss of prospective economic opportunity tort claims in *Masters Grp. Int'l* all had contractual underpinnings. 352 P.3d at 1115–16. The various torts alleged by the plaintiffs arose directly from the defendant's failure to comply with the terms of the contract. *Id.* Plaintiffs' strict liability claims have no such contractual underpinnings. Plaintiffs' claims stand with or without a contract. Connecticut law does not apply. The contract between Central and Kaman does not

8

control the choice of law as Plaintiffs' claims arise from a strict liability theory rather than breach of contract theory. Plaintiffs' damages claims can proceed.

Kaman bases its argument on the application of the UCC and freedom to contract principles. (Doc. 81. at 10–12.) Montana's law clearly applies tort remedies to plaintiffs regardless of the existence of contract and explicitly has rejected application of the UCC in strict liability cases. *Thompson*, 647 P.2d at 336. Montana law allows further for strict liability claims between commercial entities. *Streich*, 692 P.2d at 444–45. Plaintiffs allege no contract claims against Kaman. *(See* Doc. 38) Plaintiffs allege seven claims in their Complaint. (*Id.*, ¶¶ 49–83.) Three of those claims involve strict product liability claims. (*Id.*, ¶¶ 49 – 64.) Plaintiffs premise the other four claims (negligence and damages claims) on the strict product liability claims and do not relate to the contract between Central and Kaman. (*Id.*, ¶¶ 65–83.)

## II. Whether Central's Future Lost Profits are Speculative

Kaman argues Central's future lost profits prove speculative because the damages analysis lacks key opinion testimony on the duration of losses and the appropriate discount rate. (Doc. 81 at 22–27.) Kaman asserts that Central's experts have failed to provide sufficient information to determine when losses will cease thereby leading to speculation by the factfinder. (*Id.*)

Montana law allows damages for lost profits. *Lee v. Kane*, 893 P.2d 854, 857 (Mont. 1995). Lost profit damages "may be awarded if not speculative." *Id.*

9

Damages still may be awarded when speculation exists "where injury caused by the breach is certain." *Hostetter v. Donlan*, 719, P.2d 1243, 1245 (Mont. 1986). When the damages caused by the breach is certain, lost profits can be calculated by the jury "on a reasonable basis . . . and [using] the best evidence available under the circumstances." *Stensvad v. Miners & Merchs. Bank*, 640 P.2d 1202, 1210 (Mont. 1982); *see also* Montana Pattern Jury Instruction 2d 25.42; Ninth Circuit Pattern Jury Instructions No. 5.2, 5.4.

The key distinction regarding speculative damages, as noted by the Montana Supreme Court, depends on whether "mere guesswork as to whether or not the claimed damages is a result of the Defendants' action, rather than to an uncertainty as to the amounts of damages." *Lee*, 893 P.2d at 857. In other words, Plaintiffs' speculative damages are acceptable and need only provide the jury with a reasonable basis for calculation so long as certainty exists the damages can be attributed to Kaman's breach. *See id.* at 859 (holding that expert testimony is not required to prove lost profits).

Plaintiffs' experts provide a reasonable basis for their calculation. (*See* Doc. 162 at 23–25.) Kaman remains free to challenge Plaintiffs' expert at trial through cross-examination. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). As a matter of Montana law, however, speculative damages regarding future lost profits remain a matter for the finder of fact. *Stensvad*, 640 P.2d at 1210.

### III. Whether Central has Suffered Lost-Value Damages

Kaman argues first that Central's lost-value damages claim fails because the value of two other grounded K-MAX helicopters owned by Central has increased after the crash. (Doc. 81 at 27–28.) Kaman asserts that the grounded K-MAX helicopters owned by Central remains subject to a limitation-of-liability provision. (*Id.*) Kaman does not actually move for summary judgment on this issue. (*Id.*) Kaman instead asserts that it "intends to file a motion in limine directed to Central's lost-value damages claim as to its remaining helicopter . . . [and] [t]o the extent that this Court grants Kaman's motion, Kaman reserves the right to seek summary judgment on the basis that Central has failed to establish any lost-value damages claim as to its remaining helicopters." (*Id.*) Kaman has not brought a motion in limine on this issue. Kaman's motion fails.

Even if the Court were to entertain Kaman's arguments, disputed material facts exist that preclude summary judgment. Central's appraiser established a value of the three remaining helicopters between $5.2 million and $5.9 million. (Doc. 161, ¶¶ 87, 112.) One of those helicopters sold for $3.58 million. (*Id.*, ¶ 113.) Central's appraiser concluded the $3.58 million sale fell below market expectations. (*Id.*, ¶114.) This evidence proves relevant to whether Central suffered lost-value damages. Kaman remains free to challenge the basis of Central's appraiser's testimony at trial. *Daubert*, 509 U.S. at 596.

## IV. Whether Evidence Supports Punitive Damages

Kaman argues that Plaintiffs cannot show entitlement to punitive damages as a matter of law where no clear and convincing evidence exists of Kaman's actual malice or intentional disregard of a high probability of injury. (Doc. 81 at 28–32.) Kaman asserts that the Woody Crash provides no evidence of Kaman's knowledge of a defect, as the issues in the present case differ materially from those in the Woody Crash. (*Id.*)

Montana law allows an award of punitive damages where a defendant acts with actual malice. Mont. Code Ann. § 27-1-221(2). "Actual malice occurs when a defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and then proceeds to act with indifference or disregard of the high probability of injury." *Hagen v. Dow Chem. Co*, 863 P.2d 413, 420 (Mont. 1993). Such an inquiry often proves factually intensive and should be left to the fact finder.

The Montana Supreme Court discussed in *Hagen* the issue of punitive damages. 863 P.2d 413. The plaintiffs filed a lawsuit to recover damages after over 8000 pounds of fish died following the application of a weed poison by the Madison County Weed Management District near their fish farm. *Id.* at 415–17. The trial court granted summary judgment in favor of the defendants on the basis of the

plaintiffs had failed to provide sufficient evidence to establish that the weed poison caused the fish deaths. *Id.* The Montana Supreme Court reversed. *Id.*

*Hagen* noted that the plaintiffs "were not required to prove during the summary judgment proceedings that [the defendant's] actions constituted actual malice, but rather that a genuine dispute exist[ed]" regarding plaintiffs' punitive damage claim. *Id.* at 420. Sufficient evidence existed to raise a factual dispute "regarding whether [the defendant] represented to EPA that a warning label was not required when it knew otherwise, and whether [the defendant] represented that it was safe to mix the herbicides and apply the mixture in the vicinity of fish cultures, when it knew otherwise." *Id.*

Plaintiffs allege that Kaman knew about the servo flap issue following the Woody Crash in 2010. (Doc. 161, ¶¶ 115–22; *see also* Doc. 162 at 31–35.) Plaintiffs argue further that discovery had not yet closed at the time of the briefing on Kaman's motion. Plaintiffs had yet to take Kaman's Rule 30(b)(6) deposition which may reveal additional evidence regarding punitive damage claim. (Doc. 162 at 31–33.)

Kaman relies on *Dunn v. Ancra Int'l LLC* to support its argument that Plaintiffs are not entitled to punitive damages. 2011 WL 4478478 (D. Mont. Sept. 26, 2011). The plaintiffs in *Dunn* filed a products liability lawsuit after a defective load binder struck the plaintiff between the eyes and injuring him. *Id.* at *1. The plaintiffs sought punitive damages. *Id.* The court found that the plaintiffs had failed

13

to provide clear and convincing evidence that the defendant's load binder and winch bar created a high probability of injury. *Id.* at **5–7. The court reached this conclusion by comparing the more than 400,000 load binders sold by the defendant since 1986 to the 14 known incidents over a 50-year period from *all* load-binder distributors in the industry. *Id.* at *6. The evidence could not "allow a reasonable trier of fact to find beyond any serious or substantial doubt that Ancra's load binder creates a high probability of injury." *Id.* The court concluded that the plaintiffs were precluded from seeking punitive damages. *Id.* at *7.

The present case differs from *Dunn*. *Dunn* makes no distinction of the load-binder incidents that resulted in fatalities as compared to those load-binder incidents that resulted in injuries. *See* 2011 WL 4478478. The present case involves a fatality. A reasonable trier of fact could conclude that a single fatality from a crash in a fleet of 60 K-MAX helicopters creates a high probability of injury. The first fatal K-MAX crash occurred in 2010 in the Woody Crash. (*See* Doc. 161, ¶ 117.) Dr. Rakow's report concluded that the servo flap in the 2010 crash separated from the blade. (*Id.*) Kaman brought all K-MAX operators to its headquarters following the Woody Crash. (*Id.*, ¶ 118.) Kaman presented its theory to the K-MAX operators as to what caused the Woody Crash. (*Id.*)

Plaintiffs allege that Kaman failed to disclose Dr. Rakow's findings to the K-MAX operators. (*Id.*) Plaintiffs also point to the difference in the 0.0035 percent

14

*incident* rate in *Dunn* and the 5 percent *fatality* rate for K-MAX helicopters. (*See* Doc. 162 at 33–34.) This evidence presents an issue of material fact regarding whether Kaman knew that the servo flaps could create a high probability of injury. *Dunn*, 2011 WL 4478478 at *6. The trier of fact should determine this issue. The Court will allow Plaintiffs' punitive damages claim to remain.

### V. Whether Plaintiffs have Disclosed Experts with Sound Methodology

Kaman asserts that it plans to file *Daubert* motions against Plaintiffs' experts, arguing that their opinions lack sound methodology and reserves the right to seek summary judgment based on that motion. (Doc. 81 at 32.) Kaman has not briefed this issue. (*See id.*) The Court will reserve ruling on this issue until after it rules on the motions in limine and determines if subsequent briefing is necessary.

### CONCLUSION

The Court finds that Kaman's reliance on the UCC and freedom to contract principles is misplaced. Montana law explicitly rejects the application of the UCC in strict liability cases and allows for strict liability claims between commercial entities. The Court also determines that Central's future lost profits are not speculative to the extent that they preclude recover. Montana law permits damages for lost profits when the injury caused by the breach is certain. The Court finds that disputed material facts exist regarding Central's lost-value damages claim,

15

precluding summary judgment on this issue. The Court finds that a genuine dispute of material facts exists as to whether Kaman acted with actual malice or intentional disregard of a high probability of injury regarding Plaintiffs' claim for punitive damages. That issue must be determined by the trier of fact. The Court reserves ruling on the soundness of Plaintiffs' expert methodology until after addressing the motions in limine and determining whether additional briefing is necessary.

## ORDER

Accordingly, **IT IS ORDERED** Kaman's Motion for Partial Summary Judgment (Doc. 80) is **DENIED**.

DATED this 3rd day of April, 2025.

_____
Brian Morris, Chief District Judge
United States District Court