# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| CENTRAL COPTERS, INC., a Montana corporation,<br><br>             Plaintiffs,<br><br>    v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware Corporation,<br><br>             Defendants. | **No. 2:21-CV-71-BMM**<br><br><br>**ORDER ON MOTION FOR JUDGMENT AS A MATTER OF LAW** |

## INTRODUCTION

The Court held a jury trial in this matter from April 28, 2025, to May 8, 2025. (Docs. 300, 303, 304, 305, 306, 312, 315, 318, and 319.) The jury found in favor of Plaintiffs Robyn Duffy, as personal representative of the estate of Thomas Duffy, Mark and Pam Duffy, the parents of Thomas Duffy, and Central Copters, Inc., (collectively "Plaintiffs"), on their defective product and negligence claims against Defendant Kaman Aerospace Corporation ("Kaman"). (Doc. 330.) The jury awarded the Plaintiffs $22 million in damages for the loss of Duffy and the impact on Central's operations. (*Id.*)

Kaman filed a motion under Fed. R. Civ. Pro. 50 requesting that the Court enter judgment as a matter of law. (Doc. 316.) Kaman appropriately filed the motion after all the evidence had been presented and before the case had been submitted to the jury. (Doc. 316, *see* Fed. R. Civ. Pro. 50(a)(2).) The Court deferred ruling on the motion and submitted all issues to the jury. Kaman orally renewed its motion under Fed. R. Civ. Pro. 50(b). The motion was declared moot and replaced by this renewed motion for judgment as a matter of law. (Doc. 357.) The Court held a hearing on the motion on September 25, 2025. (Doc. 387.)

## BACKGROUND

The Court previously has recited the factual background in this case at length. *See Duffy v. Kaman Aerospace Corp.*, No. 2:21-CV-71-BMM, 2025 WL 1000989 (D. Mont. Apr. 3, 2025). The Court will not reiterate here the factual background causing this litigation. The Court will note that this case was tried before a jury in April and May of 2025. The trial lasted nine days. (*See* Doc. 300; Doc. 303; Doc. 304; Doc. 305; Doc. 306; Doc. 312; Doc. 315; Doc. 318; Doc. 319.) The jury returned a $22 million verdict for Plaintiffs on May 8, 2025. (Doc. 328.)

## LEGAL STANDARD

A motion for judgment as a matter of law under Fed. R. Civ. P. Rule 50(b) can be granted only if "there is no legally sufficient basis for a reasonable

jury to find for that party on that issue" *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109–10 (9th Cir. 2013) (internal quotations and citation omitted). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *E.E.O.C. v. Go Daddy Software*, *Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) *Go Daddy Software, Inc*., 581 F.3d at 961 (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). "[T]aking a motion under submission and ruling on it after the jury returns a verdict is propre practice, the court 'may not substitute its view of the evidence for that of the jury.'" *Krechman*, 723 F.3d at 1110 (quoting *Winarto v. Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1283 (9th Cir. 2001) (internal citation omitted)).

## DISCUSSION

Kaman concedes the jury's findings on Plaintiffs' manufacturing defect and negligence claims, in addition to the award of $6 million for the value of the Accident Helicopter. (Doc. 350 at 5.) Kaman alleges it is entitled to judgment as a matter of law on the following claims: (1) the award of $6 million for alleged lost value of the Non-Accident Helicopters to Central; (2) the $6 million award of future lost business earnings and profits to Central; and (3) on "the lost value of the Non-Accident Helicopters and lost earnings and profits awards based upon the CPLA and the contractual damage limitation." (*Id*. at 5-8.)

I.    <u>The $6 million for Lost Values of the Non-Accident K-Max Helicopters</u>

Kaman argues that it is entitled to judgment as a matter of law on the $6 million award for the lost value of the three Non-Accident K-Max Helicopters. Kaman notes that Central presented no evidence of the fair market value of the Non-Accident K-Max Helicopters immediately following the accident. (Doc. 350 at 5.) Kaman asserts that Central abandoned its claims of defects in the Non-Accident K-Max Helicopters, and that no precedent exists for recovering lost value of one product based on defects in another. (*Id*. at 6.) Kaman contends that Central's expert provided a fair market value for a date four years after the accident, which proves insufficient. (*Id*. at 6–7.)

Kaman argues further that even if the Court ignores the lack of immediate post-accident value evidence, the evidence shows that the fair market value of the Non-Accident Helicopters increased after the accident, not decreased, thus negating any lost value claim. (*Id*. at 8.) Kaman asserts that Central's expert applied a discount rate based on distressed sales, which fails to reflect fair market value. (*Id*. at 9–10.) Kaman emphasizes that no evidence links any lost value of the Non-Accident K-Max Helicopters to a defect in the Accident Helicopter. (*Id*. at 10–12.) Kaman asserts that Central voluntarily decided to ground and sell the helicopters, and the decision was not due to any defect. (*Id*.) The Court will address each of these arguments in turn.

a. <u>Kaman's argument that no precedent exists for recovering lost value of one product based on defects in another</u>

Kaman asserts that Central dropped its claims for negligence and strict liability with respect to the Non-Accident Helicopters. The jury found against Central's design defect claim. These factors leave Central with damages for a defect in another product (the Accident Helicopter) as the only basis for Central to recover damages as to the Non-Accident Helicopters. (Doc. 384 at 4.) Kaman asserts that it knows of no cases, and Central cites none, that provide for recovery of "the lost value of one product based upon a manufacturing defect in a different product." [emphasis redacted] (*Id*.) Kaman also cites no cases to support its contention that the law bars such recovery.

Central does not directly respond to this argument. Central cites to the jury instructions that provide a basis for this recovery. (Doc. 368 at 12.) Central cites Instruction No. 32 which stated that should the jury find Kaman liable for its negligence and manufacturing defects, the jury "must determine the amount of money which will reasonably and fairly compensate the Plaintiff for *all* loss caused by the Defendant, regardless of whether such loss could have been anticipated." (Doc. 368 at 15 citing Doc. 320 at 34.) Central also cites to Instruction No. 33 which instructed the jury to "consider the following non-exhaustive list when awarding damages" including "[t]he difference between the fair market value of

5

any damaged property immediately before the occurrence and its fair market value immediately thereafter." (Doc. 368 at 12 citing Doc. 320 at 35).

The Court finds that the jury fairly included the lost value of the Non-Accident Helicopters in this calculation. The jury awarded damages related to "the lost value of the Remaining K-Maxes when the sales of those aircraft closed at significantly lower prices than fair market values because the K-Max aircraft has had multiple fatalities." (Doc. 368 at 14 citing Doc 350-1, 27:17-25). Kaman did not dispute evidence that fatal crashes had softened the market for K-Max helicopters. (Doc. 368 at 14.) It is logical and reasonable for the jury to have determined that the value of the remaining K-Maxes decreased in the eyes of Central and the market following the accident(s). Regardless of whether such loss was anticipated, the manufacturing defect and negligence of Kaman in regard to the Accident K-Max Helicopter, detrimentally impacted the resale value of the Non-Accident K-Max Helicopters. The jury fairly awarded damages for this diminution in value.

      b. <u>Kaman's argument that Central failed to meet its burden of proving lost value damages because Central's expert provided a fair market value for a date four years after the accident</u>

Both parties presented expert testimony to the jury regarding the lost value of the Non-Accident K-Max Helicopters. Plaintiffs' expert, David Crick, testified regarding the value of the Non-Accident K-Max helicopters. (*See* Doc. 350-1.)

Crick discussed his background, methodology, and calculations for reaching the value of the Non-Accident K-Max helicopters. (*See id*.) Crick testified to the fair market value of the Non-Accident K-Max helicopters at two points in time: (1) immediately before the accident; and (2) the fair market value as of September 30, 2024, the day he performed his analysis. (*Id*.) Crick explained that he applied a "30 to 40 percent" discount rate to adjust his fair market value calculations. (*Id*. at 80-81.)  Kaman's economic expert, Charity Rowsey, testified that she was "not challenging any [of] Plaintiff Crick's numbers." (Doc. 350-2 at 7.)

Kaman now asserts that Central's diminution in value calculation proves incorrect as a matter of law because Crick testified to the fair market value of the K-Maxes on September 30, 2024, rather than *immediately after* the damage. (Doc. 384 at 5.) Kaman bases that assertion on Jury Instruction No. 34, which stated "[y]our award may include reasonable compensation for damage to business property that is either (a) the cost of repair, or (b) the difference in the value of the property immediately before and immediately after the damage, whichever is less." (Doc. 320 at 36.) Kaman correctly asserts that this instruction comports with the Montana Pattern Jury Instructions. MPI 25.40.

Kaman relies on *Covey v. Brishka,* 445 P.3d 785 (Mont. 2019), to support its argument that the jury's damage award was improper. *Covey* involved a strict-liability action between neighboring landowners. *Id*. at 789–92. Covey sued

Brishka after a 4.5-million-gallon man-made pond breached and damaged Covey's driveway. *Id*. The damage resulted in an increase in driveway construction cost from $233,000 to $498,000. *Id*. A jury awarded damages of $211,563.40 to Covey. *Id*. Brishka appealed the award of damages for the driveway cost and for diminution of Covey's property value, among other issues. *Id*. The Montana Supreme Court affirmed the decisions of the Montana state district court concerning evidence admitted and arguments permitted at trial. *Id*. at 382-83. The Montana Supreme Court also concluded that nothing in the jury verdict form amounted to reversible error. *Id*.

Central responds by asserting that Kaman misplaces reliance on *Covey*. Central notes that the quoted statement from *Covey* comes from another case, *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 165 P.3d 1079, 1086 (Mont. 2007). The Montana Supreme Court stated in *Sunburst* that "no single measure of damages can serve in every case to adequately compensate an injured party." [citation omitted.] *Sunburst* was an environmental contamination case where the jury awarded the plaintiffs restoration damages for gasoline pollution to the town's water. *Id*. Central argues that *Sunburst* stands for the proposition that no single measure of damages exists that would be appropriate in all property damage cases. (Doc. 368 at 13.)

8

Kaman attempts to distinguish *Sunburst* from *Covey* and the issue here by arguing that *Sunburst* dealt with environmental contamination whereas this case involves damages to personal property, not real property. (Doc. 384 at 7.) This back and forth proves unhelpful to the Court's analysis. The cited cases by both parties—*Sunburst*, *Covey*, and *Hoenstine v. Rose*, 312 P.2d 514 (Mont. 1957)— primarily addressed whether a party can recover restoration damages in place of diminution in value damages. *Sunburst*, 165 P.3d; *Covey*, 445 P.3d.

These cases provide no specific insight into a jury's calculation of diminution in value damages. The cases do not address the issue of a plaintiff not immediately calculating losses. The analysis in *Hoenstine* focuses on whether the plaintiff could recover from the defendant for damage to his truck even though he did not repair it following the accident. *Hoenstine*, 312 P.2d. *Covey* and *Sunburst* do not even state the standard as requiring a calculation "immediately after" the damage. The decisions instead state the measure as being "before and after the injury." *Covey*, 445 P.3d at 377; *Sunburst*, 165 P.3d at 269. *Hoenstine* interchangeably refers to the standard as 'before and after' or, citing a case from the Supreme Court of South Carolina, "immediately before [] and immediately after []." *Hoenstine*, 312 P.2d at 565, citing *Coleman v. Levkoff*, 122 S.E. 875, 875 (S.C. 1924).

The jury instruction in this case stated fair market value "immediately after the damage." (Doc. 320 at 36.) Central argues that the relevant "damage" on this issue occurred at the time when the Non-Accident Helicopters were sold. (Doc. 368 at 15.) Central asserts that the date when the Non-Accident Helicopters were sold was the point at which it realized the loss from their diminution of value. (*Id*.) The Court does not find this theory persuasive.

Central also argues that Jury Instruction No. 33, the general damage instruction that told the jury to "to consider the following non-exhaustive list when awarding damages," provides an explanation for the guidelines the jury used when assessing damages here. (Doc. 368 at 11.) Kaman asserts that Central's argument allows it to "rewrite the law on diminution in value damages via alternative calculations." (Doc. 384 at 5.) The Court disagrees.

*Semenza v. Bowman*, 885 P.2d 451 (Mont. 1994), proves helpful to this discussion, although it is not perfectly analogous to this case as Kaman points out. *Semenza* affirmed the award of damages to the plaintiff, a barley farmer, after a crop sprayer's negligence damaged the crops. (*Id*.) The damage calculations in the case were based on the price of the crops on the sale date rather than the harvest date. (*Id*.) The Montana Supreme Court held that the price on the day of sale represented the proper damage measure. (*Id*.) Kaman argues that the precedent

from *Semenza* is not relevant because there was no causation issue in *Semenza* and the delay in sale was "not done to enhance their damages." (*Id*. at 456.)

Kaman correctly argues that the jury did not find liability for a design defect in this case. It is not accurate to state no causation issue exists. The Court already recognized that the manufacturing defect and negligence of Kaman in regard to the Accident K-Max Helicopter detrimentally impacted the resale value of the Non-Accident K-Max Helicopters. Kaman also asserts that Central's statement that evidence of multiple fatal crashes softened the market for K-Max helicopters is improper because the jury was asked to hold Kaman accountable for this accident and not other fatal crashes. (Doc. 384 at 7-8.) The Court does not need to sparse out which fatal crash caused the depression in the market for K-Max helicopters. Causation has been sufficiently proven for the jury to return a damages award on the lost value issue.

No evidence exists that Central waited to sell the Non-Accident Helicopters to enhance their potential damages. Central needed to operate its business and respond to the devastating loss of the owners' son and a pilot who was a key man in Central's operation. (Doc. 368 at 18.) The record shows that over the year following Duffy's death, Central was attempting to find the balance between maintaining necessary business operations and paying employees, while also

keeping those very same employees safe. Nothing in the record indicates Central kept the helicopters to hedge its bets in a lawsuit five years down the line.

It is also unreasonable to assert that the only way for Central to recover damages for the eventual sale of the Non-Accident Helicopters at a loss would have been to sell the helicopters immediately. The jury awarded damages based on a reasonable and logical calculation when it considered the lost value to Central when the sales of those aircraft closed at lower prices than the fair market values.

    c.  <u>Kaman's argument that the evidence shows the fair market value of the Non-Accident Helicopters increased, not decreased, negating any lost value claim</u>

Central presented evidence at trial through its expert, Crick, that the sale of the remaining helicopters "fell below market expectations." (Doc. 368 at 18 citing Doc. 205 at 11 [Court Order Denying Kaman's Motion for Partial Summary Judgement].) Crick also testified during his deposition that he calculated the fair market value of the Non-Accident Helicopters on September 30, 2024. (Doc. 350 at 11, citing Doc. 251 at 69-72 [deposition of Crick].) There is no particular significance of the date of September 30, 2024, it is simply the date Crick completed the calculation. (Doc. 350 at 11.)

Kaman asserts that Crick admitted that the fair market values of two of the helicopters increased from the day of the accident to fall 2024. (Doc. 350 at 8. citing Doc. 251 at 73-74, 82-83.) Kaman cites Crick's expert report and deposition

and states that "the fair market value of Helicopter 3 (N1152) increased from

$4,825,000 to $5,225,000, and the fair market value of Helicopter 4 (N1162)

increased from $5,600,000 to $5,975,000." (Doc. 350 at 8.) Kaman further argues

that "[t]he only helicopter that Crick claimed decreased in value was Helicopter 2

(N4147)—and it only decreased from $5,550,000 to $5,375,000." (*Id*.) Kaman

alleges that these numbers prove that "the total fair market value of the three Non-

Accident Helicopters increased by $600,000." (Id.)

Crick used a "30 to 40 percent" discount rate to explain why the sales of

Central's Non-Accident Helicopters fell below the alleged market values. (Doc.

350 at 9. citing Doc. 251 at 80-81.) Kaman argues this discount rate adjustment

proves insufficient to support the lost value damages claimed by Central. (Doc. 350

at 9.) Kaman notes first that the sales occurred a year after the accident, and second

that Central could only recover the difference between fair market values, not the

difference between fair market value and eventual sale value. (*Id*.) Central

responds by alleging that the Court already has determined that the evidence that

the sale of the Non-Accident Helicopters "fell below market expectations" "proves

relevant to whether Central suffered lost-value damages." (Doc. 368 at 18, citing

Doc. 205 at 11.)

Kaman cites no case law supporting its claim that the difference in fair

market value represents the only proper measure for damages as compared to using

fair market value and sale value. Kaman also repeatedly criticizes Crick's

calculations because they were completed on September 30, 2024. Kaman also

uses the calculations to support its argument on fair market value increases. To take

Kaman for its word, the September 30, 2024, calculations should be considered

irrelevant to the damages calculation which leaves the Court with no other

numbers to assess diminution in value other than those from the sales. It proves

illogical that Central would have sold the helicopters for less than they were

allegedly worth if it had a willing buyer at the higher price as 'fair market value'

suggests there should be. The Court finds that the evidence on fair market value

does not negate Central's lost value claim.

      d.  <u>Kaman's argument that Central's expert applied a discount rate based on distressed sales, which does not reflect fair market value</u>

Crick applied a "30 to 40 percent" discount rate to explain why the sales of

Central's Non-Accident Helicopters fell below the alleged market values. (Doc.

350 at 9. citing Doc. 251 at 80-81.) Kaman argues this discount rate adjustment

proves insufficient to support the lost value damages claimed by Central. (Doc. 350

at 9.) Kaman argues that Crick acknowledged that the sales of the helicopters

appeared to be distressed sales. (Doc. 350 at 13 citing Doc. 251 at 83.) A distressed

sale is "where one party has compulsion to sell or compulsion to purchase." (*Id*.)

Kaman alleges that Crick admitted that Central chose to engage in the below-

market-value sales due to financial distress. (*Id.*)  Kaman cites to Crick's

deposition where Crick responded "that's my perception, yes" when asked if

Central "needed the funds more than it needed to wait for a higher price." (*Id.*

citing to Doc. 251 at 83-84.) Crick also noted that the helicopter in question at the

time "had been on the market for some period of time." (Doc. 251 at 83.)

Kaman argues this fact pattern indicates a distressed sale which "is the

antithesis of fair market value." (Doc. 350 at 14.) Kaman cites *Burnett v. Ala*

*Moana Pawn Shop*, 3 F.3d 1261, 1263 (9th Cir. 1993), which held that a

transaction entered based upon one party's "need for cash" did not reflect "the fair

market value of his property." The Ninth Circuit in *Burnett* addressed whether a

pawn shop's transactions properly were characterized as loans making it subject to

Hawaii law prohibiting deceptive trade practices and the federal Truth in Lending

Act. *Id.* at 1262. The Ninth Circuit determined from the record that "[t]he

negotiations on the amount of money advanced concerned Burnett's need for cash

rather than the fair market value of his property." *Id.* at 1263.

Kaman also cites to *In re McElroy*, 210 B.R. 833, 835 (Br. D. Or. 1997),

which explained "[t]he term 'fair market value' reflects the cash price that a willing

buyer would pay a willing seller in an arms-length transaction, free of any

compulsion or duress." This quote from *McElroy* is found in a paragraph where the

court discusses a car valuation that the plaintiffs had challenged as too low. *Id.*

*McElroy* discusses the various mechanisms and factors to consider in a car valuation, all of which may alter the cash paid for a vehicle while still being representative of the value of the vehicle. *Id*. at 835-36.

Kaman alleges that testimony from Mark Duffy admitting that numerous willing buyers existed following the accident provides evidence that Central's later sales were entered by choice and not necessity. (Doc. 350 at 14.) Central responds that it was not comfortable selling the aircrafts at the time because it did not think they were safe. (Doc. 252 at 19.) Duffy stated he said he could not "in good conscious sell [them] these aircraft." (*Id*.) Central also responds that when it eventually sold the aircraft, it was for "the only prices to which the buyers would agree." (Doc. 368 at 18.)

Kaman cites case law that demonstrates that courts typically distinguish between fair market value and sales value. *See Burnett*, 3 F.3d at 1263 and *In re McElroy*, 210 B.R. at 835; *see also Trs. of Washington-Idaho-Montana-Carpenters-Emps. Ret. Tr. Fund v. Galleria P'ship*, 780 P.2d 608, 616 (Mont. 1989) (discussing procedures to determine fair market value at time of forced foreclosure sale for purposes of deficiency); *see also Dollar Tree Stores Inc. v. Toyama Partners LLC*, 875 F. Supp. 2d 1058, 1081 (N.D. Cal. 2012) (discussing dispute between fair market value at the time of sale).

Other courts have diverged from the hardline market value evaluation in the context of diminution in value damages. In *Adams v. United States*, 823 F. Supp. 2d 1074 (D. Idaho 2011), the court held that "a deviation from [the] strict, "market-value-of-the-crop" measure of damages should be allowed if necessary to make a plaintiff whole." *Id*. at 1082. *Adams* cited a case from the Idaho Supreme Court which held that a variation from the diminution in market value measure was appropriate when plaintiffs did not actually the cultivate the trees that were damaged for timber but just kept them for aesthetic value. *Id*. citing *Weitz v. Green*, 230 P.3d 743, 758–59 (Idaho 2010). *Adams* stated that "more recent decisions allowed deviation from the diminution-in-market-value rule to accommodate the basic goal of compensatory damages, which is "'to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.'" *Adams*, 823 F. Supp. 2d at 1082, citing Rest. (Second) of Torts § 901 cmt. a (1979).

A compensatory approach may be appropriate in the damages context based on diminution of value. In *Bos v. Dolajak*, 534 P.2d 1258, 1260 (Mont. 1975), the Montana Supreme Court rejected the defendant's claim that the law failed to support the jury's verdict because the damages award was too high. The jury had awarded the plaintiffs an amount closer to the cost of purchasing a new silo after theirs had been damaged instead of the actual market value of their silo at the time of the loss. *Id*. *Bos* referenced *Spackman v. Ralph M. Parsons Co*., 414 P.2d 918,

921 (Mont. 1966), for insight into the purpose of damages in cases involving damage to property. *Id*.  *Bos* concluded that the basic objective of making the plaintiff whole had to be applied and thus the greater damages amount was supported by law. *Id*.

Spackman differentiates types of personal property though, seeing a difference between that property that naturally has a market value and property that does not. *Spackman*, 414 P.2d at 921. *Spackman* concluded that compensatory damages were appropriate for damaged items that had no readily ascertainable market value, but for other items like "machines, dryers, vacuum cleaners and such," the plaintiffs were limited to the fair market value of the items at the time closest to destruction. *Id*. The plaintiff could not recover the cost of replacement for new machines even though this effort had caused them a loss. *Id*. *Bos* seemingly viewed the silo to be property without a readily ascertainable market value so compensatory damages were deemed appropriate. *Bos*, 534 P.2d at 1260.

A typical helicopter likely has a readily ascertainable fair market value. The helicopters at issue here, however, were unique in design. The limited sales of the K-Max helicopters reflect the unique design and special use. These facts also prove that it was reasonable for the jury to rely upon the sales values rather than the alleged fair market values of the Non-Accident K-Max Helicopters. Further calculations also may demonstrate that the sales amounts received reflected the

18

true fair market value based on the safety concerns and fatalities associated with the K-Max helicopters.

The fact that there were willing buyers immediately after the accident does not prove relevant to the allegations that the later sale was "distressed." Those earlier offers may be evidence of the sale value of the helicopters immediately following the accident, indicating the fair market value at that point had not yet decreased. Kaman's own expert, Charity Rowsey, also testified that "there had been no loss on the sale of the helicopters because the sales price exceeded the book value of the helicopters." (Doc. 363 at 13 citing Trial Transcript, 05-05-2025, 13:23-16:8.) Rowsey's testimony directly conflicts with Kaman's current allegation that the helicopters were sold in a 'distressed sale' that does not reflect their market value at the time. The conflicting evidence and unique nature of the K-Max helicopters indicates that the jury fairly calculated the lost value of the Non-Accident Helicopters.

> e. <u>Kaman's argument that Central's decision to ground and sell the helicopters was voluntary and not due to any defect</u>

Kaman alleges that Central's decision to ground and sell the Non-Accident Helicopters was voluntary and not due to any defect. (Doc. 350 at 16.) Kaman alleges that Central chose to ground and sell the aircrafts because it was under financial distress. (*Id*. at 14.) Kaman asserts that the financial distress was "caused,

in no small part," by alleged large director's fees and loans Mark and Pam Duffy

took for personal use from Central. (*Id*. at 14-15.) Central responds that the jury

already rejected this attack against Mark and Pam Duffy. (Doc. 368 at 19.) Central

asserts that the helicopters were sold to "mitigate damages" following this

litigation, the efforts to transition to Blackhawk helicopters, and for no other

improper purpose. (*Id*.)

Central asserts that the Duffys and their accounting witnesses testified that

the couple did not inappropriately take money from Central and rather, they

"structured for tax purposes charitable giving and monies used for building aircraft

hangars." (*Id*.) Central asserts that it accounted for these expenditures in its losses

and that these expenditures had nothing to do with the remaining Non-Accident K-

Maxes. (*Id*.) The jury heard testimony on this matter.

The Court will not grant judgment as a matter of law to Kaman on this

matter. The Court "may not make credibility determinations or weigh the

evidence" on a motion for judgement as a matter of law. *E.E.O.C. v. Go Daddy*

*Software, Inc*., 581 F.3d 951, 961 (9th Cir. 2009) (alteration in original) (quoting

*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000)). "[T]aking a

motion under submission and ruling on it after the jury returns a verdict is proper

practice, the court 'may not substitute its view of the evidence for that of the jury.'"

*Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1110 (9th Cir. 2013) (quoting

*Winarto v. Toshiba Am. Elecs. Components, Inc*., 274 F.3d 1276, 1283 (9th Cir. 2001) (internal citation omitted)). Kaman asks the Court to weigh evidence and make credibility determinations concerning the reasons for Central's decision to sell the helicopters. The Court declines to do so. The Court will deny Kaman's motion for judgment as a matter of law pertaining to the lost value on the Non-Accident Helicopters.

II.   <u>Future Lost Business Earnings and Profits</u>

Kaman argues that Central's expert methodology regarding the $6 million award for future lost business earnings and profits proved speculative and based on assumptions contrary to facts, such as projecting constant losses despite decreasing trends over time. (Doc. 350 at 13–14.) Kaman asserts that Central's experts failed to consider other factors affecting Central's earnings, such as the COVID-19 pandemic and changes in contract rates. (Doc. 350 at 14-15.)

Central asserts that the Court already rejected the same argument that the approach was speculative and found that the methods of its experts, Dr. Kober and Dr. Abbot, provided a "reasonable basis for their calculation [and] Kaman remains free to challenge Plaintiff's expert at trial through cross-examination." (Doc. 368 at 21 citing Doc. 207 at 24-25.) The order from the Court stated:

> Damages still may be awarded when speculation exists "where injury caused by the breach is certain." *Hostetter v. Donlan*, 719, P.2d 1243, 1245 (Mont. 1986). When the damages caused by the breach is certain, lost profits can be

21

calculated by the jury "on a reasonable basis . . . and [using] the best evidence available under the circumstances." *Stensvad v. Miners & Merchs. Bank*, 640 P.2d 1202, 1210 (Mont. 1982); *see also* Montana Pattern Jury Instruction 2d 25.42; Ninth Circuit Pattern Jury Instructions No. 5.2, 5.4.

(Doc. 205 at 10).

The order further stated:

The key distinction regarding speculative damages, as noted by the Montana Supreme Court, depends on whether "mere guesswork as to whether or not the claimed damages is a result of the Defendants' action, rather than to an uncertainty as to the amounts of damages." *Lee*, 893 P.2d at 857. In other words, Plaintiffs' speculative damages are acceptable and need only provide the jury with a reasonable basis for calculation so long as certainty exists the damages can be attributed to Kaman's breach. *See id*. at 859 (holding that expert testimony is not required to prove lost profits).

(Doc. 205 at 10).

The Court agrees with Central. The Ninth Circuit has concluded that the jury's award should be upheld unless "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Johnson v. Paradise Valley Unified Sch. Dist*., 251 F.3d 1222, 1226 (9th Cir. 2001); *see also Zhang v. Am. Gem Seafoods, Inc*., 339 F.3d 1020, 1040 (9th Cir. 2003). A high bar exists to overturn a jury's award based on a claim of speculation. The Court already addressed this claim and found the methods of the experts were sufficiently reasonable. The Court will deny Kaman's motion for judgment as a matter of law on the future lost business earnings and profits.

III.   <u>Lost Value of the Non-Accident Helicopters and Lost Earnings and</u>
       <u>Profits Awards Based upon the CPLA and the Contractual Damage</u>
       <u>Limitation</u>

Kaman claims that its argument regarding consequential damages limitations under the Connecticut Product Liability Act and by contract is included in its motion in an "abundance of caution to ensure that the Court's prior definitive rulings on these issues are preserved for review." (Doc. 350 at 23 n.2.) The Court addressed this argument at the summary judgment stage of this litigation. (*See* Doc. 205 at 4–9; Doc. 206 at 4–5.) The Court will deny Kaman's motion on this issue based upon the Court's prior rulings.

Accordingly, **it is ORDERED** that:

1. Kaman's motion for Judgment as a Matter of Law (Doc. 316) is
   **DENIED**.

**DATED** this 7th day of November, 2025.


_____
Brian Morris, Chief District Judge
United States District Court

23